T. ROLAND BERNER et al., as Executors of WILLIAM KAPELL, Deceased, Respondents, *v.* UNITED AIRLINES, INC., et al., Defendants, and BRITISH COMMONWEALTH PACIFIC AIRLINES, LTD., et al., Appellants.

First Department, December 18, 1956.

*George Foster, Jr.,* of counsel (*Cyril Hyde Condon* with him on the brief; *Condon & Forsyth,* attorneys), for appellants.

*Aaron Lewittes* of counsel (*Julian S. Bush, M. Victor Leventritt* and *Sidney Bender* with him on the brief; *T. Roland Berner,* in person, attorney), for respondents.

BERGAN, J. The Warsaw Convention governing international airline traffic was approved by the United States Senate in 1934 and proclaimed October 29 of that year (49 U. S. Stat. 3000 *et seq.*). Australia was one of the signatories of the Convention.

Article 28 of the Convention provides that " An action for damages " must be brought " in the territory of one of the High Contracting Parties " either " before the court of " the principal place of business of " the carrier " or where the carrier " has a place of business through which the contract has been made, or before the court at the place of destination."

Defendant British Commonwealth Pacific Airlines, Ltd., is an Australian corporation. In May, 1953, there was in existence between it and defendant British Overseas Airways Corporation a written agreement in respect of business to be conducted for British Commonwealth Pacific. British Overseas was appointed " General Sales Agent "; was required to " observe and comply with all reasonable directions and instructions "

given it by British Commonwealth Pacific " concerning all matters affecting or arising out of this Agreement ".

British Commonwealth Pacific, on its part, undertook certain affirmative obligations to its " general sales agent " which go very far beyond the usual conception of mere principal and sales agent relationships. For example, the air carrier in agreement with the sales agent was to see to it not only that " All airline aircraft " would be provided with a current certificate of airworthiness issued by appropriate authority, but also that such aircraft " will at all times and in all respects be operated " conformably with the certificate of airworthiness, and besides " be suitable for the carriage of passengers ".

Further conditions between the British Commonwealth Pacific and British Overseas required in minute detail the former to provide certain types of personnel; the maintenance of a technical log; and to set up additional specific affirmative operational conditions.

In the event of accident arising from British Commonwealth Pacific operation, British Overseas was required by its contract to employ its staff to " give every assistance in its power " to British Commonwealth Pacific, including making of statements and production of documents " and by any other means as required in the circumstances " " [i]n any investigation or inquiry "; and a similar duty was reciprocally binding on British Commonwealth Pacific if British Overseas needed assistance in its own investigations. These mutual obligations were not limited to accidents, but included investigations or inquiries " instituted by either party as a result of any occurrence ".

British Overseas continued its responsibility to British Commonwealth Pacific for the performance of its contract, even though it subcontracted or delegated the performance of the acts undertaken. The agreement further covered a number of detailed matters in respect of promotion and carrying out British Commonwealth Pacific's business.

In 1953, British Overseas maintained an office in New York in which it carried out the business required by its agreement with British Commonwealth Pacific and this included appropriate telephone and office listings. On May 7, 1953, British Overseas, in pursuance of the agreement under which it acted for British Commonwealth Pacific, sold at this New York Office a ticket over British Commonwealth Pacific Lines from San Francisco to Sydney, Australia, and from Sydney to San Francisco, to William Kapell.

In an accident on a British Commonwealth Pacific plane, Mr. Kapell was killed while a passenger using the ticket which had thus been issued in New York; and his executors maintain this action against British Commonwealth Pacific and others in the New York Supreme Court.

The summons on British Commonwealth Pacific was served by making service on Peter Ball, an assistant to the manager, North American Division of the general sales agent, British Overseas; and it is stipulated by British Commonwealth Pacific in the record that he was " a proper person " to receive process for British Overseas. A motion to vacate the service of the summons has been denied by the court at Special Term.

The ticket issued in New York, and pursuant to which British Commonwealth Pacific undertook to carry the decedent as a passenger, expressly provided on its face that carriage " is subject to the rules related to liability established by " the Warsaw Convention; but since British Commonwealth Pacific is a corporation of Australia which was a signatory of the Convention, and the ticket was sold and the flight undertaken in the United States, which had by adherence given the Convention the force of law, the carrier would in any event be bound by the Convention.

By the express language of the Convention, the New York Supreme Court became vested with jurisdiction of " An action for damages " as described in article 28. It is a court in the territory of one of the High Contracting Parties; and it is " the court " where the carrier " has a place of business through which the contract has been made ".

This language includes places maintained by the carrier itself or through agents at which the ticket is sold. The language describes a " place of business ", not necessarily in the broad or general connotation of the term, but one closely related to the sale of the ticket, i.e., where the " contract has been made ".

A definite location in the area of jurisdiction, some regularity in the business of selling tickets, and the sale there of the ticket which gives rise to " An action for damages " seem literally to meet the requirements of the situs of the court contemplated by the Convention. As to the specific contract of transportation here involved, the New York Supreme Court meets exactly the Convention requirements for jurisdiction.

Whether the process that has been served, however, has given us jurisdiction in personam of British Commonwealth Pacific depends upon the extent that it was "doing business " in New York through the activities of British Overseas on its behalf. Exact definition of " doing business " in this context has never

been achieved. There is, as Judge Cardozo noted in *Tauza* v. *Susquehanna Coal Co.* (220 N. Y. 259, 268) "no precise test of the nature or extent of the business that must be done." He added that all "that is requisite" is that "enough be done" so that the New York court will be able to say that the defendant "is here". The repeated citation of this decision confirms the elasticity of the basic concept.

The *Cardozo* opinion distinguished the decision in *Green* v. *Chicago, Burlington & Quincy Ry.* (205 U. S. 530) which involved "nothing more than that of solicitation" (p. 533) as the Supreme Court itself later distinguished it as "lacking a continuous course of business" in the solicitation of orders (*International Harvester* v. *Kentucky*, 234 U. S. 579). The decision in *Holzer* v. *Dodge Bros.* (233 N. Y. 216) turned on the special intramural relation of Dodge with its automobile dealers and did not weaken these general principles.

Finally, it must be manifest that the concept of "doing business", even that resting on mere solicitation by salesmen, has been broadened by *International Shoe Co.* v. *Washington* (326 U. S. 310) which upheld sales activity as a ground of substituted service of process.

The agency in New York created by British Commonwealth Pacific's contract was one of extraordinary breadth. It was not mere solicitation of business. The contract, as it has been seen by reference to the written agreement, delegated to the agent acting in New York the right in respect of the New York contracts of carriage to require a rather large number of operational and other aspects affecting the execution of the New York contract of carriage; and the duties of the agent acting in New York were broadly reciprocal and included assistance and aid in very general language.

Activities of this kind of a corporate representative is "doing business" in the traditional sense. In principle it thus comes fairly close to the problems considered in *Goodman* v. *Pan American World Airways* (1 Misc 2d 959).

And it seems to us, finally, that when British Commonwealth Pacific undertook by its agent to make a contract of air carriage in New York, expressly and in terms governed by the Warsaw Convention, at a "place of business" within the jurisdiction of the New York Supreme Court and that place of business is literally one "through which the contract has been made", it is doing business in such a way as to give jurisdiction by the service of process on the agent who thus is brought with the carrier's approval within the literal terms of the Convention.

14

An intent to do business in New York and the implementation of the intent by activity in making the contract furnish sufficient criteria of activity here to give jurisdiction, when the Convention, the contract between carrier and agent, and the contract of carriage are seen in context.

The same objection to jurisdiction is made by defendant sued as Quantas Empire Aviation, Ltd., which seems to have succeeded to certain of the rights of British Commonwealth Pacific Airlines, Ltd., but no distinction is made in the arguments or briefs between this corporation and British Commonwealth Pacific; and since the parties treat them in a unitary sense, we see no reason to distinguish between them in the form in which the case reaches us for decision.

The order should be affirmed, with $20 costs and disbursements.

BOTEIN, J. P., RABIN, FRANK and VALENTE, JJ., concur.

Order unanimously affirmed, with $20 costs and disbursements to the respondents.