**Martha ECK, Plaintiff-Appellant,**

v.

**UNITED ARAB AIRLINES, INC.,**

**Defendant-Appellee.**

**No. 43, Docket 29610.**

United States Court of Appeals
Second Circuit.

Argued Oct. 19, 1965.

Decided May 13, 1966.

Edward M. O'Brien, Speiser, Shumate, Geoghan & Krause, New York City (Stuart M. Speiser, New York City, of counsel), for plaintiff-appellant.

Douglas B. Bowring, Haight, Gardner, Poor & Havens, New York City, for defendant-appellee.

Before WATERMAN, MOORE and FRIENDLY, Circuit Judges.

WATERMAN, Circuit Judge:

This action was commenced in the United States District Court for the Southern District of New York by appellant Martha Eck, a resident of California, against appellee United Arab Airlines (UAA), an alien corporation organized and existing under the laws of the United Arab Republic. Appellant sought to recover damages for personal injuries that she allegedly suffered when on March 16, 1962 an airplane owned and operated by UAA crashed in the vicinity of Wadi Halfa, Sudanese Republic, Africa. District court jurisdiction was alleged under 28 U.S.C. § 1332(a) (2).

Prior to answer, UAA moved, pursuant to Fed.R.Civ.P. 12(b), to dismiss the complaint on the grounds that: (1) the New York state courts had decided the same claim adversely to appellant and principles of res judicata prohibited the claim's relitigation;[1] (2) the district

---

1. The plaintiff first brought suit against this defendant in the New York Supreme Court. That court, without opinion, denied the defendant's motion to dismiss for lack of jurisdiction over the subject matter and for improper venue. The Appellate Division reversed and dismissed the complaint. Eck v. United Arab Airlines, Inc., 20 App.Div.2d 454, 247 N.Y.S.2d 820 (App.Div.1964). After the defendant's motion to dismiss the present federal proceeding had been granted by the court below, the decision of the Appellate Division was reversed by the New York Court of Appeals, which reinstated the trial court's order denying defendant's motion

court lacked jurisdiction over the subject matter of appellant's claim; (3) the district court lacked jurisdiction over the person of UAA; and (4) venue was improper. UAA also moved for summary judgment pursuant to Fed.R. Civ.P. 56. The court below concluded that it need not pass on the first ground stated in the motion to dismiss, it considered and rejected the second and third grounds, and went on to hold that the action should be dismissed because "in fact no venue exists in this court pursuant to the provisions of Article 28(1) of the Warsaw Convention." Eck v. United Arab Airlines, S.A.A., 241 F. Supp. 804, 807 (S.D.N.Y. 1965). For reasons set forth hereafter we hold that in so ruling the district court erred; therefore we reverse and remand for further proceedings.

## I.

The appellant was a member of a group that flew from Los Angeles to Europe on February 23, 1962 on a charter flight operated for the Far West Ski Association by Scandinavian Airlines System (SAS). The contract of carriage called for the group to return to Los Angeles on or about March 26, 1962. All arrangements for this SAS-operated, round-trip flight, were made by the ski association. Appellant apparently decided that she would take full advantage of her presence in Europe during February and March 1962, for, without the assistance of the ski association, she planned a side trip to Southern Europe and the Near East. Before departing for Europe on the charter flight, appellant purchased through the Oakland, California office of SAS a ticket for her separate trip, which named Zurich as both the place of departure and the place of destination. This ticket listed as agreed stopping places the cities of Vienna, Istanbul, Athens, Beirut, Jerusalem, Cairo, Rome, and Naples. Several different airlines were to provide the transportation specified in the tickets;[2] only the Jerusalem to Cairo portion of the transportation was to be provided by UAA. As noted earlier, during the Jerusalem to Cairo leg of the Zurich to Zurich flight, UAA's airplane carrying appellant crashed near Wadi Halfa and appellant allegedly suffered serious injuries due to the negligence of UAA.

The manner in which it was agreed that UAA would transport appellant is a well-established feature of contemporary air transportation. A quick glance at the relevant schedules told the SAS clerk who waited on appellant that the airplanes of UAA regularly flew between Jerusalem and Cairo. He sold appellant reserved space on an appropriate flight and collected the fare. SAS then contacted the home office of UAA, located in Cairo, in order to confirm this reservation, thereby avoiding the confusion of duplicate or conflicting reservations. Finally, SAS made arrangements to forward to UAA the fare it had collected.

UAA had offices in the United States located at 720 Fifth Avenue in New York City and at 510 W. 6th Street in Los Angeles, but neither was involved in any direct way with the sale of the ticket to appellant. These offices primarily existed and continue to exist in order to service the needs of large metropolitan areas and supervise the promotional activity that resulted in more than $1,000,-000 in United States bookings for UAA in 1963.[3] Space on a UAA flight need not be purchased at one of these two offices; indeed, it can be purchased at the ticket counter of almost any airline operating in the United States as easily as appellant purchased space on UAA's Jerusalem to Cairo flight at the

---

to dismiss. Eck v. United Arab Airlines, Inc., 15 N.Y.2d 53, 255 N.Y.S.2d 249, 203 N.E.2d 640 (1964).

2. The transportation called for by appellant's ticket was to be performed as follows: Zurich to Vienna, by Swissair; Vienna to Istanbul, by SAS; Istanbul to Athens, by Swissair; Athens to Beirut and Beirut to Jerusalem, by Middle East Airlines; Jerusalem to Cairo, by United Arab Airlines; Cairo to Rome to Naples to Rome, by Alitalia; and Rome to Zurich, by Swissair.

3. Travel Weekly, April 28, 1964, p. 34.

Oakland, California office of SAS. UAA *might* have decided to channel all ticket purchases through one of its offices in the United States, but it did not. Instead, all reservations, wherever made in the United States, were cleared through Cairo.

## II.

■ In a case like that presently before us a court must decide *in limine* whether the Warsaw Convention [4] is applicable.[5] Frequently resolution of this threshold question poses issues of considerable complexity. See e.g., Mertens v. Flying Tiger Line, Inc., 341 F.2d 851 (2 Cir. 1965). Here, however, the Convention unquestionably applies. No one disputes that appellant's travel was "international transportation" as defined in Article 1(2).[6] And this is sufficient to invoke the Convention.

■ Application of the provisions of the Warsaw Convention means in the first instance that the present suit can be maintained only in one of the four forums enumerated in Article 28(1), an article that restricts the forums in which damage actions may be brought in order to foreclose the possibility of suit in the courts of a nation that has no substantial connection with an accident, or in courts that lack advanced judicial procedures. Mertens v. Flying Tiger Line, Inc., supra at 855; Goodhuis, National Airlegislations and the Warsaw Convention, 287 (1937); McKenry, Judicial Jurisdiction under the Warsaw Convention, 29 J. Air L. & Com. 205 (1963).[7] Article 28(1) provides:

> An action for damages must be brought, at the option of the plaintiff, in the territory of one of the High Contracting Parties, either before the court of the domicile of the carrier or of his principal place of business, or where he has a place of business through which the contract has been made, or before the court at the place of destination.

The United States does not qualify as a "territory" [8] in which this suit may be maintained under three of Article 28(1)'s four provisions enumerating per-

4. Convention for the Unification of Certain Rules Relating to International Transportation by Air, adhered to by United States June 27, 1934, 49 Stat. 3000 (concluded at Warsaw, Poland, October 12, 1929) [hereinafter this opinion will simply cite to revelant Articles of the Convention]. On November 15, 1965 the United States formally denounced the Warsaw Convention, effective May 15, 1966, unless the airlines serving the United States agree to raise the Convention's limitation on liability to $75,000, and ultimately to $100,000. Such action would not affect the present case.

5. Appellant, fearing that she will not prevail on the issue of the interpretation of Article 28(1), makes a wholesale attack on the constitutionality of the Convention. Our disposition of the appeal enables us to avoid this issue.

6. Article 1(1) provides that the convention "shall apply to all international transportation of persons * * * by aircraft for hire." Article 1(2) then defines "international transportation" as *inter alia* "transportation in which, according to the contract made by the parties, the place of departure and the place of destination * * * are situated * * * within the territory of a single High Contracting Party, if there is an agreed stopping place within a territory subject to the sovereignty, suzerainty, mandate or authority of another power, even though that power is not a party to this convention." Switzerland is a High Contracting Party and appellant's flight involved agreed stopping places within territory subject to the sovereignty of other powers.

7. As the then Judge Marshall wrote in Mertens v. Flying Tiger Line, Inc., supra at 855, Article 28(1) disqualifies "forums in the High Contracting Party where the accident fortuitously occurred * * * or those in the High Contracting Party where the passenger was domiciled, or those in other High Contracting Parties that had absolutely no contact with the flight, carrier, or passenger."

8. Judge Marshall's opinion in Mertens v. Flying Tiger Line, Inc., supra, makes it clear once and for all that Article 28(1) was written with reference to nation-states, not to political subdivisions of nation-states; when the present opinion refers to a "place" or "country" where Article 28(1) permits suit, this language must always be understood as referring to a nation-state, not to a political subdivision.

missible forums. UAA is domiciled in Egypt and its principal place of business is also in that country.[9] The United States was not the "place of destination" stated in appellant's ticket, and was not mentioned therein. Therefore, even though the United States is a "High Contracting Party," this suit is maintainable in the United States if, but only if, we can conclude that in the United States UAA "has a place of business through which the contract [of carriage between appellant and UAA] has been made." The thrust of most of UAA's arguments advanced to support its motion to dismiss is that the third provision of Article 28(1), from which the foregoing language is quoted, cannot justify the maintenance of this suit in the United States because the contract between appellant and UAA was not made "through" one of UAA's places of business in the United States.

### III.

We consider it advisable to consider each of the four arguments UAA urged below as grounds for dismissal even though some of these arguments are insubstantial and UAA presses only the last on this appeal.

#### A. *Res Judicata*

When the present case was argued in the court below, the New York Appellate Division, First Department, had already dismissed an identical suit between these same parties on the ground that Article 28(1) did not permit the action to be maintained in New York.[10] UAA argued in the district court that the federal case consequently should be dismissed because the parties had already once litigated the issue to a conclusion. The district court's disposition of the case avoided any resolution of this contention. Now this argument has arisen to haunt UAA because the New York Court of Appeals has reversed the Appellate Division and remanded the case for further proceedings, holding that maintenance of this suit in New York is consistent with the Warsaw Convention.[11] We need not, however, decide the vexing question whether principles of *res judicata* oblige us to respect this state-court determination, for the appellant has not here contended that we are so bound by the Court of Appeals decision, and we have independently reached the same result as the New York court, although on somewhat different grounds.[12]

#### B. *Subject Matter Jurisdiction*

The second contention advanced below by UAA was that the suit should be dismissed because Article 28(1) of the Warsaw Convention ousts the district court of jurisdiction over the subject matter of appellant's claim. This argument would become important only if UAA had not moved to dismiss on the ground that venue was improper under Article 28(1), but the defendant did so move and thereby all the relevant issues

9. It seems fairly well settled that for purposes of Article 28(1) an airline has only one "principal place of business." E.g., Nudo v. Societe Anonyme Belge D'Exploitation De La Navigation Aerienne Sabena Belgian World Airlines, 207 F. Supp. 191, 192 (E.D.Pa.1962) ; cf. Eisenberg v. Commercial Union Assur. Co., 189 F.Supp. 500 (S.D.N.Y.1960).; contra Eck v. United Arab Airlines, Inc., 15 N.Y.2d 53, 63, 255 N.Y.S.2d 249, 254, 203 N.E.2d 640, 644 (1964) (Desmond, J., concurring).

10. See note 1 supra.

11. Ibid.

12. If the New York Court of Appeals had dismissed the complaint for lack of proper venue under the Warsaw Convention, we would have been obliged to respect that determination under principles of *res judicata*, whether or not certiorari was being sought. See Goldfarb v. Wright, 135 F.2d 188, 190 (2 Cir. 1943) ; 1B Moore, Federal Practice ¶ 0.416[3] at 2252 (2d ed. 1965). The question we here leave open is whether we similarly should respect a state-court determination that, under traditional concepts, is not a final state-court judgment subject to review by the U. S. Supreme Court under 28 U.S.C. § 1257. See Southern Pac. Co. v. Gileo, 351 U.S. 493, 496, 76 S.Ct. 952, 100 L.Ed. 1357 (1956). But cf. Mercantile Nat'l Bank v. Langdeau, 371 U.S. 555, 558, 83 S.Ct. 520, 9 L.Ed.2d 523 (1963).

concerning the interpretation and application of this Article have been raised. See infra subsection D.

### C. *In Personam Jurisdiction*

■ We also reject UAA's third contention, advanced below, that the district court lacked jurisdiction over UAA's person. New York law is, of course, determinative of this jurisdictional issue because the "amenability of a foreign corporation to suit in a federal court in a diversity action is determined in accordance with the law of the state where the court sits * * *." Arrowsmith v. United Press, Int'l, 320 F.2d 219, 223 (2 Cir. 1963). We look first to Section 302 (a) (1) of the New York Civil Practice Law and Rules, which permits a federal court to exercise jurisdiction over a foreign corporation if the corporation "transacts any business within the state" and the cause of action sued upon is one "arising from" this transaction of business.[13] UAA clearly "transacted business" in New York; it maintained a substantial executive and sales office at 720 Fifth Avenue, where it actively sought to solicit passengers and also engaged in promotional ventures designed to increase UAA's bookings in the state and throughout the nation. It is equally clear, however, that Section 302(a) (1) cannot be invoked to sustain jurisdiction in the present case. The appellant points to no facts even tending to suggest that the alleged negligence of UAA and consequent injury to appellant "arose from" UAA's transaction of business in New York, despite the fact that this is a condition of jurisdiction under Section 302(a) (1). See Gelfand v. Tanner Motor Tours, Ltd., 339 F.2d 317 (2 Cir. 1964; Scott v. Middle East Airlines Co., 240 F.Supp. 1, 4 (S.D.N.Y. 1965).

■ Jurisdiction over UAA was nevertheless proper under Section 301 of the New York Civil Practice Law and Rules, which provides that "[a] court may exercise such jurisdiction over persons, property or status as might have been exercised heretofore." Prior to the adoption of Section 302, indeed prior to the Supreme Court's decision in International Shoe Co. v. State of Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), New York regularly asserted *in personam* jurisdiction over foreign corporations if they engaged in continuous and substantial solicitation in New York on the theory that this activity made them "present" in New York. Tauza v. Susquehanna Coal Co., 220 N.Y. 259, 115 N.E. 915 (1917). This pre-*International Shoe* "presence theory" was based on a quantitative approach to questions of jurisdiction; it focused on the amount of activity in the forum state without explicitly considering the burden on the defendant if he were required to defend there or the need for adjudication in that forum as compared to the need to adjudicate in others. See Developments in the Law—State-Court Jurisdiction, 73 Harv. L.Rev. 909, 921–23 (1960). In *International Shoe* the Court announced a new jurisdictional standard: whether the foreign corporation had certain "minimum contacts" with the state such that the maintenance of the suit would not offend traditional notions of fair play and substantial justice. 326 U.S. at 316, 66 S.Ct. 154. Single act, "long arm" statutes like Section 302 of the New York Civil Practice Law and Rules have their constitutional underpinnings in the new standard. See McGee v. International Life Ins. Co., 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957). But the classic

---

13. § 302. Personal jurisdiction by acts of non-domiciliaries.

(a) Acts which are the basis of jurisdiction. A court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, as to a cause of action arising from any of the acts enumerated in this section, in the same manner as if he were a domiciliary of the state, if, in person or through an agent, he:

1. transacts any business within the state; or

2. commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act; or

* * * * *

"presence" theory based on quantitative examination of a foreign corporation's activities within a state has proven to be of continued significance. Single act statutes like Section 302 ordinarily require that the cause of action sued on must "arise from" or relate to the in-state acts of the non-resident corporation.[14] Such statutes therefore cannot serve as a basis for jurisdiction when, as in the present case, a non-resident corporation that carries on extensive business activities within a state [15] is sued on a cause of action unrelated to these in-state activities. But in such a case jurisdiction frequently can be sustained on the ground that the classic Section 301 quantitative test is met and the nonresident corporation is thus "present" within the state. Indeed, in a recent case remarkably like the present, the New York Court of Appeals relied on precisely this theory to sustain jurisdiction over a nonresident airline that engaged in systematic and continuous business activity in New York in a suit arising out of circumstances unrelated to this activity. In Bryant v. Finnish Nat'l Airline, 15 N.Y. 2d 426, 260 N.Y.S.2d 625, 208 N.E.2d 439 (1965), the plaintiff alleged that at a Parisian airport he was injured due to the negligence of Finnair, the defendant. Finnair's principal place of business was in Helsinki, it was not registered to do business in New York, it operated no aircraft in the United States, and all of its flights began and ended outside this country. Finnair did have a one-and-a-half room office in New York, staffed with three full-time and four part-time employees. The principal function of this office was to receive reservations for European travel on Finnair from other airlines or travel agencies, which the office forwarded to Helsinki; this office also engaged in some promotional activity. The office did not sell tickets for European travel on Finnair. This activity was held by the New York Court of Appeals to constitute a sufficient continuous and systematic course of doing business in New York so that Finnair could be said to be "present" in New York. See also Berner v. United Airlines, Inc., 3 App.Div.2d 9, 157 N.Y.S.2d 884 (1956), aff'd mem. 3 N.Y.2d 1003, 170 N.Y.S.2d 340, 147 N.E.2d 732 (1957). The existence of jurisdiction over UAA in the present case would appear to follow *a fortiori* from *Bryant*. Here, too, the nonresident airline maintained a New York office that forwarded reservations which it received to the foreign home office and also engaged in promotional activity. Furthermore, in the present case, the UAA New York office also issued tickets and collected fares for transportation on UAA flights. Without doubt New York courts would rely on the "presence" theory and assert jurisdiction over UAA.[16] Arrowsmith v. United Press Int'l, supra, teaches us that this state standard should also be applied in diversity actions brought in federal courts located in New York.

### D. Venue

We thus reach appellee's final and most substantial claim, that the complaint was properly dismissed because venue was improper under Article 28(1) of the Warsaw Convention. This claim is bottomed on the inapplicability of three of Article 28(1)'s four provisions enumerating fo-

14. Indeed, it may be argued that the requirement that the cause of action "arise from" the in-state acts of the non-resident corporation is constitutionally required. See International Shoe Co. v. State of Washington, 326 U.S. at 317, 66 S.Ct. 154; Developments in the Law—State-Court Jurisdiction, 73 Harv.L.Rev. 909, 930–32 (1960).

15. The "transacting business" requirement of New York Civil Practice Act, § 302(a) (1) clearly is met in the present case.

16. Some commentators have suggested that the Court's opinion in *International Shoe* implicitly rejected the "presence" theory of jurisdiction. See Developments in the Law—State-Court Jurisdiction, 73 Harv. L.Rev. 909, 930–32 (1960). Nevertheless, as Bryant v. Finnish Nat'l Airline, supra, indicates, state courts have continued to rely on quantitative assessments of a defendant corporation's activities within the forum state to sustain jurisdiction in cases like the one before us.

rums in which damage actions subject to the Warsaw Convention must be maintained,[17] and on UAA's contention that the third of these provisions, which permits suit to be maintained in a territory where UAA "has a place of business through which the contract has been made," does not place venue in the United States because the contract between appellant and UAA was made through the Oakland office of SAS and directly confirmed by UAA's Cairo office. The court below dismissed the action on this ground, stating that this third provision in Article 28(1) was "clear in its meaning and that to permit a suit by this plaintiff in this district, however attractive that may be, would read a meaning into the treaty not originally intended." 241 F.Supp. at 808. We disagree.

■ The problem of interpretation posed by this case should not have been resolved by a mechanical application of the third provision's language and the easy assertion that a contrary result would conflict with unarticulated notions about the original intent of the Convention's framers. A court faced with this problem of interpretation, or another problem like it, can well begin with an inquiry into the purpose of the provision that requires interpretation. The language of the provision that is to be interpreted is, of course, highly relevant to this inquiry but it should never become a "verbal prison." Sullivan v. Behimer, 363 U.S. 335, 358, 80 S.Ct. 1084, 4 L.Ed.2d 1254 (1960) (Frankfurter, J., dissenting). Other considerations, such as the court's sense of the conditions that existed when the language of the provision was adopted, its awareness of the mischief the provision was meant to remedy, and the legislative history available to it, are also relevant as the court attempts to discern and articulate the provision's purpose. The inquiry may lead the court to conclude that the provision's language accurately reflects its purpose; in such a situation the court is most faithful to the purpose if the language is interpreted literally. Conversely, the inquiry may lead the court to conclude that the language of the provision only imperfectly manifests its purpose, or that when the words were first chosen the language accurately reflected the provision's purpose but that today the same words imperfectly reflect this purpose because conditions have changed in the area to which the words of the provision refer. It would be inconsistent with the "wise counsel to reject 'the tyranny of literalness,'" Cappadora v. Celebrezze, 356 F.2d 1 (2 Cir. 1966), if the court in the latter situations did not seek to interpret the provision so as to effectuate its purpose, even if this requires departing in some measure from the letter and reading the language in a practical rather than literal fashion. See Cawley v. United States, 272 F.2d 443, 445 (2 Cir. 1959).[18]

■ We first turn to consider the conditions that existed when Article 28(1)'s third provision was conceived. This provision was drafted in 1926, adopted in 1929, and alhered to by the United States in 1934. Commercial international air travel, which began in Europe no earlier than 1919 and in the United States in 1927,[19] was in its infancy during this

17. See text accompanying note 9 supra.

18. The principles of interpretation set out in the text are of a general applicability. They would seem, however, to have a special relevance when it is a treaty that must be interpreted, for the language of such a document is less likely to be modified in the light of changing conditions than is the language passed by a legislative body that convenes regularly. Cf. Kolovrat v. Oregon, 366 U.S. 187, 192–194, 81 S.Ct. 922, 6 L.Ed.2d 218 (1961).

19. It was not until the end of 1919 that commercial air service by plane was established between London, Paris, and other cities in Western Europe. Shawcross & Beaumont, Air Law (2d ed. 1951). The United States lagged far behind European nations in the development of commercial passenger transportation by air. Western Air Line carried the first passenger in May 1926. N. Y. Times, April 3, 1966, § 1, p. 86, col. 4. It was not until 1927 that Pan American Airways inaugurated service over the ninety mile international route between Key West and Havana.

period. Some informal interline arrangements enabling potential passengers to purchase tickets for air transportation on one airline at the ticket office of another airline not actually performing the transportation developed during the 1920's. But such interline arrangements were then by no means as ubiquitous in the commercial international air transportation industry as they are today.[20] It is against this factual background that the purpose of Article 28(1)'s third provision is best elaborated.

Article 28(1)'s third provision permits a passenger injured in international air transportation to bring a damage action against the airline transporting the passenger at the time of the accident in the courts of a country which is a High Contracting Party if the airline "has a place of business" in that country "through which the contract has been made." This provision clearly manifests the framers' intention to permit, at least in some cases, the maintenance of suit in the courts of the country where the ticket was purchased.[21] It is equally clear that another purpose of this provision is to prevent the maintenance of suit in the courts of the country where the ticket was purchased if the airline has no ticketing and booking office there. The close question is whether this provision prevents the maintenance of suit in the courts of the country where the ticket was purchased, when the airline "has a place of business" in that country at which its tickets are regularly sold, but the passenger had purchased his ticket at the office of another airline or at a travel agency. The argument for concluding that a purpose of this provision is to foreclose suit in the latter rests on two assumptions: first, it assumes the framers recognized that an airline might establish a regular place of business and permit the sale of its tickets in the territory of a High Contracting Party, and yet, by means of interline agreements, arrange for all sales of its tickets to be "made" at the offices of other airlines or travel agencies and further require that all such sales be confirmed abroad; second, the argument assumes that, having adverted to this problem, the framers intended to permit airlines to avoid the letter of this provision in this manner. We do not find this argument persuasive. We have not been acquainted with any facts tending to establish that the framers of Article 28(1)'s third provision recognized that airlines could avoid the letter of this provision in this fashion. Indeed, interline arrangements among commercial international air carriers were relatively few when the Convention was drafted, and this strongly suggests that the framers did not advert to this problem of avoidance for the obvious reason that airlines could not have successfully avoided the letter of Article 28(1)'s third provision in this fashion at that time. Certainly the framers were not so remarkably prescient that they foresaw future interline arrangements like those implemented by the International Air Transport Association.[22] And there is no indication in the language of this provision or in the relevant legislative history

20. See note 22 infra.

21. The country, of course, must be a High Contracting Party.

22. The International Air Transport Association (IATA) is a private organization of domestic and foreign air carriers engaged in scheduled international air transportation. See 12 C.A.B. 493, 495–98 (1951). One of IATA's major purposes as set out in its Articles of Association is "to provide means for collaboration among the air transport enterprises engaged directly or indirectly in international air transport services * * *" Shawcross & Beaumont, Air Law, 61–62 (2d ed. 1951). And pursuant to this purpose IATA has developed a standard "Interline Traffic Agreement," setting forth the rights and obligations of "issuing airlines" and "carrying airlines." A copy of this standard agreement was attached to appellant's papers opposing UAA's motion to dismiss. It is not clear whether such an explicit agreement was in effect between UAA and SAS when appellant purchased her ticket on UAA at the Oakland, California SAS office. It is clear that both UAA and SAS were members of IATA at that time. Moreover, it is clear that such interline agreements are now quite common.

that the framers intended the scope of this provision to vary depending on the ticketing and booking practices of international air carriers. For all of these reasons we have concluded that the argument's first assumption is unfounded. Rather, we think it most probable that the framers of Article 28(1)'s third provision simply did not recognize that airlines would one day be able to avoid the letter of this provision by means of interline arrangements subject to requirements that all ticket sales be confirmed at their home office.

■■■ The central purpose of Article 28(1)'s third provision was to make venue always proper in the country where the ticket was purchased—assuming it is a High Contracting Party—if, but only if, the defendant has a place of business there. The framers simply did not advert to the problem of avoidance illustrated by the present case. A judge no less distinguished than Learned Hand has taught us that in such a situation when we apply legislative commands, "[w]e are to put ourselves so far as we can in the position of the legislature that uttered them, and decide whether or not it would declare that the situation that has arisen is within what it wished to cover." Cawley v. United States, supra 272 F.2d at 445. Applying this test in light of what we understand to be the central purpose of Article 28(1)'s third provision, and bearing in mind that the framers did not advert to the problem posed by the present case, we conclude that if the framers had recognized this problem they would have wished that an airline that had a place of business in the territory of a High Contracting Party and permitted its tickets to be sold in that country be subject to suit in that country's courts.

Our holding is not an untenable gloss upon Article 28(1)'s third provision for a way is clear that permits us to give this language an interpretation that is at once linguistically satisfactory and fully implements the provision's purpose. Undeniably the Oakland, California SAS office acted as UAA's agent for purposes of issuing UAA's ticket and collecting UAA's fare. Even if this ticket sale to appellant was the only instance in which an SAS office had issued a ticket for transportation on a UAA flight, there would still be an agency relationship of sorts between UAA and SAS. However, in the absence of any proof to the contrary, this single instance of an agency relationship between SAS and UAA tends to establish that when this ticket was sold at least a tacit arrangement existed between SAS and UAA whereby each would issue tickets and collect fares for air transportation to be performed by the other.[23] We hold that this agency arrangement between SAS and UAA taken together with the existence of UAA booking offices in this country justified the conclusion that the Oakland SAS office was a UAA "place of business"—"établissement" in the official French text—"through which the contract had been made."

■■ In short, we hold that venue is proper under Article 28(1)'s third provision in the courts of a High Contracting Party when the defendant has a place of business in that country at which it regularly issues tickets even though the injured passenger's ticket is purchased at the office of another airline and confirmed abroad on the ground that the office that issued the ticket to the passenger should be regarded as a "place of business" of the defendant airline "through which the contract has been made." This holding, which imports concepts of agency into the meaning of

---

**23.** In other words, there was an agency relationship between SAS and UAA even if there was no formal interline agreement between the airlines such as that developed by IATA. See note 22 supra. Moreover, even though we need not rest upon this ground, we agree with appellant that the fact that both SAS and UAA belonged to IATA and the further fact that SAS accepted appellant's requests for transportation, in part on behalf of UAA, tends to prove that such a formal agreement did exist between the airlines. UAA submitted no evidence tending to disprove the existence of an interline agreement between it and SAS.

"place of business" in Article 28(1)'s third provision is not novel. In Berner v. United Airlines, supra, the New York courts clearly recognized that in some cases a foreign airline could be regarded as having a "place of business" in the territory of a High Contracting Party through which the contract was made, even though the airline had no office in that country and, instead, transacted all its business in that country—including the ticket sale involved in that case—through an agent there. We do not suggest that *Berner* is controlling, for the agency relationship in that case was more substantial than the interline sales arrangement here. Nevertheless, *Berner* does stand for the proposition that considerations of agency sometimes suffice to make venue proper under Article 28 (1)'s third provision. Furthermore, several respected secondary authorities suggest that when the defendant airline has at least one regular ticketing and booking office in a High Contracting Party venue should be proper in that country on an agency rationale under Article 28(1)'s third provision even though the passenger purchased his ticket for travel on a flight of the defendant at the office of another airline or travel agency. Goodhuis, National Airlegislations and the Warsaw Convention, 282 (1937); McKenry, Judicial Jurisdiction under the Warsaw Convention, 29 J.Air L. & Com. 205, 214 (1963). Third, this interpretation of Article 28(1)'s third provision imposes no unanticipated burden on foreign airlines that permit tickets on their flights to be sold by other airlines and travel agencies that do business in the territory of a High Contracting Party. Under the holding of this case Article 28(1)'s third provision will permit suit to be maintained against such airlines in that country only if in addition to authorizing their tickets to be sold there by others they also have a regular ticketing and booking office there. And whether an airline has such an office in any particular High Contracting Party is a matter over which it has complete control. If an airline does choose to establish a regular ticketing and booking office in a country that is a High Contracting Party, venue under Article 28(1)'s third provision will sometimes be proper there even under the superficially literal interpretation of this provision urged by UAA. Our holding simply means that a foreign airline which has done this cannot avoid the reach of this provision if it instructs other airlines and travel agencies that occasionally act as its sales agents in that country to confirm the sales directly with the foreign airline's overseas office. Finally, and most importantly, our holding here is justified because it effectuates the purpose of Article 28(1)'s third provision as we understand it, and it does so without doing violence to the language of this provision.

For the foregoing reasons we hold that the Oakland, California office of SAS was a UAA "place of business" in the territory of the United States "through which the contract was made." Accordingly. we reverse and remand the case for further proceedings.

MOORE, Circuit Judge (concurring in the result):

I concur in the result on the ground that the existence of United Arab Airlines offices in the United States, together with its arrangement and practice for the sale of tickets on its behalf by other agencies in the United States, constitute a place of business in this country within the meaning of Article 28(1) of the Warsaw Convention.