426 F.2d 205
 AQUASCUTUM OF LONDON, INC. and Rodex of London, Ltd.,
Plaintiffs-Appellants,
v.
S.S. AMERICAN CHAMPION, her engines, etc.; United States
Lines, Inc., Defendant, and W. Wingate & Johnston,
Ltd., Defendant-Appellee.
METASCO, INC., Plaintiff-Appellant,
v.
S.S. AMERICAN CHIEFTAIN, her engines, etc.; United States
Lines, Inc., Defendant, and W. Wingate & Johnston,
Ltd., Defendant-Appellee.
METASCO, INC., Plaintiff-Appellant,
v.
S.S. RUBENS, her engines, etc., Compagnie Maritime Belge
(Lloyd Royal) S.A., Agency Maritime International S.C.,
Belgian Lines, Inc. and N.V. Arement Deppe S.A., Inc.,
Defendants, and W. Wingate & Johnston, Ltd., Defendant-Appellee.
 Nos. 491, 492 and 493, Dockets 34083-5.
 United States Court of Appeals, Second Circuit.
 Argued Jan. 22, 1970.
Decided March 27, 1970.
 
 Andrew R. Colmant, New York City (Hill, Rivkins, Warburton, McGowan & Carey, and Leo P. Cappelletti, New York City, of counsel), for plaintiffs-appellants.
 Wells D. Burgess, New York City (White & Case, New York City, of counsel), for defendant-appellee, W. Wingate & Johnston, Ltd.
 Before MOORE, FRIENDLY and HAYS, Circuit Judges.
 FRIENDLY, Circuit Judge.
 
 
 1
 In these three appeals from an order of the District Court for the Southern District of New York dismissing complaints in admiralty for want of personal jurisdiction, we are called upon to determine the applicability of New York's long-arm statute, CPLR 302, and of its general 'doing business' statute, CPLR 301, to a London-based English corporation offering different types of freight service.
 
 
 2
 In Nos. 34083 and 34085, the American Champion and Rubens cases, the plaintiffs allege that certain goods in good order and condition were delivered to W. Wingate & Johnston, Ltd. (hereafter W&J) in London for shipment to plaintiffs in New York. W&J issued forwarder's bills of lading showing that delivery was to be made to plaintiffs in New York and bearing the legend 'For particulars of delivery apply with this bill of lading to World Warehouse Corp. (World).' One copy of each bill was given to the shipper, who mailed it to the consignee, and one copy was mailed by W&J to World. The shipments, along with goods of other shippers, were consolidated in containers owned by the shipping lines which would carry the cargo and released by them to W&J. W&J then sealed the containers with seals supplied to it by World and delivered them to the carriers, taking in return ocean bills of lading listing the contents of the containers and designating the ultimate recipients and their customs brokers-- Penson & Co. in the case of plaintiffs' shipments. These bills of lading, showing W&J as shipper and World as consignee, were mailed to World in New York. When the time came for delivery of the goods in New York, it was discovered that the seals on the containers had been broken and that some of plaintiffs' goods were missing.
 
 
 3
 The facts of No. 34084, the American Chieftain case, vary in significant respects. The goods delivered to W&J in London were enough to fill an entire container. Although W&J packed the goods in the container and delivered it to the carrier, it did not itself issue a bill of lading. The carrier's bill of lading showed W&J as shipper and plaintiff Metasco, a New York corporation, as consignee, with delivery to be made in Boston. W&J mailed the bill to Metasco in New York. Again shortages were discovered at the time of delivery. In all three cases, W&J's services were arranged and paid for in London.[1]
 
 
 4
 Shipment of goods of various shippers in a container requires someone to break the seal of the container and handle the merchandise at the port of destination. For this purpose W&J employs World and two other companies in the New York area. World, which also works for other forwarders, charges W&J for its services, which include moving the container from the pier to World's bonded warehouse, stripping the container, returning it to the carrier, and delivering the goods to the consignees.
 
 
 5
 The relations between W&J and Penson & Co. have lasted from 30 to 40 years. Each recommends the other as customs broker but since brokers are selected and paid by the importer, neither has power to appoint the other to that position. Penson has incorporated a name-holding company called Wingate & Johnston, Ltd., for which it has maintained a telephone listing at its own address in New York City, but the company is inactive and there is scant basis in the record for an inference that W&J directed or approved the establishment of the corporation. Penson also gives leads to W&J with respect to American importers who might be interested in using W&J's services in England. W&J employees visit New York and other points in the United States two or three times a year to exploit leads and solicit business generally.
 
 
 6
 In all three cases service of process on W&J was purportedly effected by delivering a copy of the summons and complaint to the offices of Penson & Co. in New York City. W&J moved under F.R.Civ.P. 12(b)(2) to dismiss the complaints as against it for lack of jurisdiction over the person and under F.R.Civ.P. 12(b)(5) to vacate the service of process as insufficient. Plaintiffs submitted opposing affidavits, which , although arguing that the service was in all respects valid, requested, in the alternative, leave to serve process upon World was W&J's managing or general agent, see F.R.Civ.P. 4(d)(3), or on W&J in England under F.R.Civ.P. 4(d)(7) (7) and CPLR 313, which authorizes extraterritorial service of process on foreign corporations either 'doing business' in New York or subject to the New York long-arm statute, CPLR 302(a). In all three cases the court directed the entry of final judgment quashing the service of process and dismissing the complaints as against W&J and making appropriate recitals under F.R.Civ.P. 54(b). This appeal followed.
 
 I.
 
 7
 It can scarcely be doubted that a British ocean carrier delivering cargo in New York would come within CPLR 302(a)(1) as a non-domiciliary who 'transacts any business within the state' and would thus be subject to suit for breach of the contract of carriage. While we have been cited to no New York decision expressly so holding, prior decisions by this court and the district courts applying New York law strongly suggest such a result. Agrashell, Inc. v. Bernard Sirotta Co., 344 F.2d 583, 588 (2 Cir. 1965); Ingravallo v. Pool Shipping Co., 247 F.Supp. 394, 401-402 (E.D.N.Y.1965). The conclusion follows from the recognition by the Court of Appeals that the design of 302 was to take advantage of the opportunity, afforded by International Shoe Co. v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945) and McGee v. International Life Ins. Co., 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957), to assert jurisdiction over a non-resident defendant who 'has engaged in some purposeful activity in this State in connection with the matter in suit.' Longines-Wittnauer Watch Co. v. Barnes & Reinecke, Inc., 15 N.Y.2d 443, 457, 261 N.Y.S.2d 8, 18, 209 N.E.2d 68, 75, cert. denied, 382 U.S. 905, 86 S.Ct. 241, 15 L.Ed.2d 158 (1965). This conclusion is reinforced by the recent decision in Parke-Bernet Galleries, Inc. v. Franklyn, 26 N.Y.2d 13, 308 N.Y.S.2d 337, 256 N.E.2d 506, upholding jurisdiction under 302(a)(1) in an action for breach of contract against a California resident who had made successful bids at a New York art auction as a result of an arrangement whereby an open telephone line was maintained between him in California and an employee of Parke-Bernet in New York, who relayed his bids to the auctioneer.[2] A carrier who brings goods into the state stands quite differently from a shipper in another state or a foreign country, Kramer v. Vogl, 17 N.Y.2d 27, 267 N.Y.S.2d 900, 215 N.E.2d 159 (1966).
 
 
 8
 We see no sufficient basis for reaching a different result with respect to W&J in the American Champion and Rubens cases. The contrary ruling of the district court appears to have been predicated, to borrow language used by the Supreme Court twenty years ago, 'on a failure to distinguish between two very different kinds of 'forwarders." Chicago, Milwaukee, St. p. & P. R.R. v. Acme Fast Freight, Inc., 336 U.S. 465, 484, 69 S.Ct. 692, 701, 93 L.Ed. 817 (1949). The Court explained the distinction as follows:
 
 
 9
 The term was originally applied to persons who arrange for the transportation by common carrier of the shipper's goods. The forwarder did not necessarily consolidate the individual consignments into carload lots, and its duties, as agent of the shipper, went no farther than procuring transportation by carrier and handling the details of shipment. Forwarders of this type charged fees for their services, which the shipper paid in addition to the freight charges of the carrier utilized for the actual transportation.
 
 
 10
 Later, a different type of forwarding service was offered. This forwarder picked up the less than carload shipment at the shipper's place of business and engaged to deliver it safely at its ultimate destination. The freight forwarder charged a rate covering the entire transportation and made its profit by consolidating the shipment with others in carload quantities to take advantage of the spread between carload and l.c.l. rates. It held itself out not merely to arrange with common carriers for the transportation of the goods, but rather to deliver them safely to the consignee. The shipper seldom if ever knew which carrier would be utilized in the carriage of his shipment.
 
 
 11
 The second type of forwarder occupies a dual role. While with respect to the carrier who physically conducts the transportation he is a shipper, Great Northern Ry. v. O'Connor, 232 U.S. 508, 514, 34 S.Ct. 380, 58 L.Ed. 703 (1914), with respect to the true shipper he is a carrier. Chicago, Milwaukee, St. P. & P. R.R. v. Acme Fast Freight, Inc., supra, 336 U.S. at 485, 69 S.Ct. 692. In the American Champion and Rubens cases W&J undertook not simply to arrange for transportation of the goods to New York City but to effect it. W&J was no less transacting business in New York because it employed steamship lines to perform the carriage for it. The shippers in England had W&J's bills of lading and only these. Whatever rights they may or may not have against the steamship carriers, they surely may pursue W&J for shortages under its contracts of carriage.
 
 
 12
 On the other hand we sustain W&J's position concerning the invalidity of the service of process upon Penson & Co. Whether or not Penson was an agent of W&J at all, it was plainly not 'a managing or general agent' or 'any other agent authorized by appointment or by law to receive service of process' within F.R.Civ.P. 4(d)(3) or CPLR 311 (and thus F.R.Civ.P. 4(d)(7)). However, in light of plaintiffs' requests that if the court held the service invalid, it should give them an opportunity to effect service in England under CPLR 313 and thus comply with F.R.Civ.P. 4(d)(7), this justified only a quashing of the service and not a dismissal of the complaints.[3]
 
 II.
 
 13
 Our recital of the facts makes it apparent that the American Chieftain claim, relating to a shipment from London to Boston not solicited within New York, does not present a cause of action arising from the transaction of business within New York. See Frummer v. Hilton Hotels International, Inc., 19 N.Y.2d 533, 535-536, 281 N.Y.S2d 41, 43, 227 N.E.2d 851, cert, denied, 389 U.S. 923, 88 S.Ct. 241, 19 L.Ed.2d 266 (1967). Appellants argue that jurisdiction should nevertheless be sustained under CPLR 301 on the theory that W&J was 'present' or 'doing business' here.[4]
 
 
 14
 The problem of what contacts with the forum state will suffice to subject a foreign corporation to suit there on an unrelated cause of action is such that the formulation of useful general standards is almost impossible and even an examination of the multitude of decided cases can give little assistance. Cases involving solicitation and confirmation of reservations in out-of-state hotels, such as Frummer v. Hilton Hotels International, supra,19 N.Y.2d 533, 281 N.Y.S.2d 41, 227 N.E.2d 851, or the sending of goods into New York by out-of-state manufacturers, such as Taca Int'l Airlines, S.A. v. Rolls-Royce of England, Ltd., 15 N.Y.2d 97, 256 N.Y.S.2d 129, 204 N.E.2d 329 (1965), provide an unreliable guide to the proper result here, and even the language in those cases, which might on its face seem applicable, must be read in light of the facts to which it refers. We have not found or been referred to any New York cases dealing with what constitutes the doing of business by freight forwarders, but for the reasons developed above, we consider the cases most closely in point to be those involving common carriers.
 
 
 15
 Before dealing with those cases, it will be useful to list the principal contacts with W&J has with New York. First, officials of W&J visit New York every few months in order to solicit freight forwarding business from New York importers, and through the mutual backscratching arrangement with Penson, New York exporters are also solicited to have W&J appointed customs broker in England. Second, it is apparent that W&J contracts for the delivery of a substantial volume of goods to New York, although the record is silent as to the exact amount, either absolutely or as a percentage of W&J's total freight-forwarding business. Third, to the extent it may be relevant, W&J engages steamship companies to undertake the actual carriage of the goods to New York, and hires World and other break-bulk agents to perform the services to get the goods from the pier into the hands of the consignees.
 
 
 16
 The New York cases on when a foreign carrier is 'doing business' in New York reveal that while the 'solicitation-puls' rule is adhered to, once solicitation is found in any substantial degree very little more is necessary to a conclusion of 'doing business.' See, e.g., Jensen v. United Air Lines Transport Corp., 255 App.Div. 611, 8 N.Y.S.2d 374 (1st Dept. 1938), aff'd mem., 281 N.Y. 598, 22 N.E.2d 167 (1939); Elish v. St. Louis S. W. Ry., 305 N.Y. 267, 112 N.E.2d 842 (1953); Bryant v. Finnish Nat'l Airline, 15 N.Y.2d 426, 260 N.Y.S.2d 625, 208 N.E.2d 439 (1965). In large measure, this broad interpretation of 'doing business' is a response to the revolution in international transportation and commerce and reflects a decision to expand New York's jurisdiction over common carriers to approach the constitutional limits. See Berner v. United Airlines, 2 Misc.2d 260, 149 N.Y.S.2d 335 (Sup.Ct.), aff'd, 3 A.D.2d 9, 157 N.Y.S.2d 884 (1st Dept. 1956), aff'd mem., 3 N.Y.2d 1003, 170 N.Y.S.2d 340, 147 N.E.2d 732 (1957). However, all the cases we have discovered which find personal jurisdiction under the 'solicitation-plus' rubric have involved either some financial or commercial dealings in New York, e.g., Elish v. St. Louis S.W. Ry., supra, 305 N.Y. 267, 112 N.E.2d 842; Bryant v. Finnish National Airline, supra, 15 N.Y.2d 426, 260 N.Y.S.2d 625, 208 N.E.2d 439; Gelfand v. Tanner Motor Tours, Ltd., 385 F.2d 116 (2 Cir. 1967), cert. denied, 390 U.S. 996, 88 S.Ct. 1198, 20 L.Ed.2d 95 (1968), or the defendant's holding himself out as operating in New York, either personally or through an agent. E.g., Jensen v. United Air Lines Transport Corp., 255 App.Div. 611, 8 N.Y.S.2d 374 (1st Dept. 1938), aff'd mem., 281 N.Y. 598, 22 N.E.2d 167 (1939); Johannesen v. Gulf & South Amer. Steamship Co., 126 F.Supp. 664 (S.D.N.Y.1954). In addition, where the activities in addition to solicitation have been particularly skimpy, the courts upholding personal jurisdiction have considered it worthy of comment that the defendant was represented in New York by its own employees rather than by an independent contractor. E.g., Bryant v. Finnish National Airline, supra, 15 N.Y.2d at 431, 260 N.Y.S.2d at 625; contrast Gertsenstein v. Peninsular & Oriental Steam Nav. Co., 202 Misc. 838, 113 N.Y.S.2d 360 (City Ct. 1952), aff'd mem., 204 Misc. 459, 126 N.Y.S.2d 439 (Sup.Ct. 1953).
 
 
 17
 Even assuming that the amount of solicitation for W&J done in New York was sufficient to trigger the 'solicitation-plus' rule, to hold that W&J may be called upon to defend any suit in New York regardless of the relationship of the cause of action with that state would thus go beyond anything the New York courts have done, and as a practical matter would mean that a freight forwarder is subject to suit on any cause of action in any jurisdiction to which it makes substantial shipments if, even without maintaining an office, it solicits such business there. We are aware of the decision of a sharply divided Court of Appeals in Frummer v. Hilton Hotels International, supra, 19 N.Y.2d 533, 281 N.Y.S.2d 41, that an English corporation operating the London Hilton was 'present' because of activities of the Hilton Reservation Service in New York in taking and confirming reservations, and particularly of the statement, 19 N.Y.2d at 537, 281 N.Y.S.2d at 44, 227 N.E.2d at 853, 854, 'In short-- and this is the significant and pivotal factor-- the Service does all the business which Hilton (U.K.) could do were it here by its own officials.' See also Gelfand v. Tanner Motor Tours, Ltd., supra, 385 F.2d 116, where we applied Frummer. Despite this we do not think the Court of Appeals meant that when a foreign corporation's activities in New York in addition to soliciting orders amount to nothing more than paying persons to perform essentially mechanical tasks for it, it is to be regarded as 'doing business' here.[5] To hold otherwise would raise constitutional doubts sufficiently serious that we should avoid such a construction in the absence of clear indication from the New York courts. See Farrell v. Piedmont Aviation, Inc., 411 F.2d 812, 817 (2 Cir.), cert. denied, 396 U.S. 840, 90 S.Ct. 103, 24 L.Ed.2d 91 (1969), citing cases.
 
 
 18
 We therefore affirm the judgment dismissing the complaint as against W&J in No. 34084. In Nos. 34083 and 34085 we affirm so much of the judgments as quashed the service of process on W&J but reverse so much of them as dismissed the complaints against W&J, with instructions to permit appellant to effect service in England. No costs.[6]
 
 
 
 [1]
 Also named as defendants in these cases were the three ships involved and various domestic and foreign shipping concerns. Only W&J is involved in the current appeal
 
 
 [2]
 Chief Judge Fuld quoted with approval, 26 N.Y.2d at 17, 308 N.Y.S.2d at 339, 256 N.E.2d at 508, the statement, 'CPLR 302 is a single-act statute requiring but one transaction-- albeit a purposeful transaction-- to confer jurisdiction in New York.' McLaughlin, Supplementary Practice Commentary to CPLR 302, McKinney's Cons.Laws of N.Y. Cumulative Pocket Suppl. for 1969-70, pp. 129-30
 
 
 [3]
 W&J's bills of lading provide:
 '23. All agreements between the Company and its customers shall be governed by English law and within the exclusive jurisdiction of English courts.'
 W&J did not assert this as a ground for dismissal in the district court, and although the court mentioned the clause in a footnote, W&J has chosen not to urge the clause as a ground for affirmance here. Appellants contend that the exclusive jurisdiction portion of Clause 23 is invalid as, under Indussa Corp. v. S.S. Ranborg, 377 F.2d 200 (2 Cir. 1967), it would be if the bill of lading is governed by COGSA, 46 U.S.C. 1300 et seq. W&J requested that we should not now rule on whether a bill of lading issued by a forwarder is subject to COGSA, and we do not do so.
 
 
 [4]
 The parties have argued on the assumption that New York law is controlling on whether W&J's activities in New York were sufficient to give the court personal jurisdiction over it in the American Chieftain case. Inasmuch as we hold that the New York standard was not met and have no reason to believe that a 'federal standard' would be more easily met, we need not decide whether federal or state law is controlling on this issue in a cause of action in admiralty, an issue we specifically left open in Arrowsmith v. United Press International, 2 Cir., 320 F.2d 219, 228 n. 9 (1963). See, however, Gkiafis v. Steamship Yiosonas, 342 F.2d 546, 549 (4 Cir. 1965); Time, Inc. v. Manning, 366 F.2d 690, 693-694 (5 cir. 1966); Volkswagen Interamericana, S.A. v. Rohlsen, 360 F.2d 437, 440 n.3 (1 Cir.) cert. denied, 385 U.S. 919, 87 S.Ct. 230, 17 L.Ed.2d 143 (1966); Hartley v. Sioux City & New Orleans Barge Lines, Inc., 379 F.2d 354, 356 (3 Cir. 1967s)
 
 
 [5]
 The Court stressed that the Reservation Service and Hilton (U.K.) were owned in common by the other defendants and that the Service was run on an 'non-profit' basis for the benefit of the London Hilton and other Hilton hotels. 19 N.Y.2d at 538, 281 N.Y.S.2d at 45, 227 N.E.2d at 854
 
 
 [6]
 One reason for not awarding partial costs to appellants despite their partial success in two of the three appeals is that their appendix contained much unnecessary matter, FRAP 30(b). Memoranda of law submitted to the trial court have no proper place either in the record transmitted to this court or in an appendix except when they become relevant to determine whether an issue was raised in the district court