**The KATZ AGENCY, INC., Plaintiff,**

v.

**The EVENING NEWS ASSOCIATION and KTVY, Inc., Defendants.**

**No. 79 Civ. 5931 (JMC).**

United States District Court,
S. D. New York.

May 13, 1981.

---

**6.** *Cf. Koscherak, supra.*

Battle, Fowler, Jaffin & Kheel, New York City (David Fleischer, New York City, of counsel), for plaintiff.

Bell, Kalnick, Beckman, Klee & Green, New York City (Allen Green, New York City, of counsel), for defendants.

## MEMORANDUM AND ORDER

CANNELLA, District Judge:

Plaintiff's motion for an order of attachment is denied. Fed.R.Civ.P. 64; N.Y.C.P. L.R. § 6201.

Defendants' motion to dismiss the amended complaint for lack of personal jurisdiction is denied. Fed.R.Civ.P. 12(b)(2).

### FACTS

The Katz Agency, Inc. ["Katz"], a Delaware corporation with its principal place of business in New York, brings this diversity action for breach of contract against The Evening News Association [the "Evening News"], a Michigan corporation operating a nationwide communications business, and KTVY, Inc., a wholly-owned Michigan subsidiary of the Evening News. KTVY, Inc., in turn, owns and operates television station KTVY in Oklahoma City. Plaintiff seeks to recover damages for the alleged premature termination in August 1979 of an agreement under which plaintiff served as the national advertising sales representative for KTVY. Following that termination, plaintiff was replaced as the station's sales representative by MMT Sales, Inc. ["MMT"], which is incorporated in New

York and has its principal place of business here.

A careful review of the relationships between each of these entities is necessary to a determination of this motion. In 1954, plaintiff contracted with KTVY's predecessor, WKY,[1] to become its exclusive national advertising representative.[2] Under the 1954 Agreement, which was amended from time to time over the years,[3] Katz solicited advertising for the station from potential customers throughout the United States. If the party solicited wished to purchase broadcast time on KTVY, it submitted its order directly to the station in Oklahoma City, where it was accepted or rejected. Katz also guaranteed the payment of all such orders accepted by the station and was empowered to bill and collect therefor.[4] Finally, the 1954 Agreement provided for termination by either party on one year's written notice.[5] The relationship between Katz and the station was a successful one, as evidenced by the fact that the parties operated under the 1954 Agreement for over twenty-five years until its termination in August 1979.

Although Katz solicited advertising for KTVY on a nationwide basis, a substantial portion of its efforts took place in New York. Between 1976 and 1979, for example, KTVY derived approximately one-third of all its national advertising revenue, amounting to several million dollars, from the New York market through Katz's efforts. Katz worked closely with KTVY personnel during this period. There is some dispute as to the degree of closeness, but it is clear to the Court that Katz and KTVY jointly developed marketing strategy, discussing from time to time KTVY's rate philosophy and structure, the impact of current economic factors, and sales strategy and techniques, although KTVY retained final decision-making authority. To facilitate this relationship, KTVY employees made periodic visits to New York. Notably, U. Nick Panos, KTVY's national sales manager, travelled to New York twice in 1976, twice in 1977, once in 1978 and once in 1979, to consult with Katz personnel. These visits, lasting from three to seven days, were unquestionably for the purpose of bolstering the working relationship between KTVY and Katz. While in New York, Katz's employees and Panos discussed and developed rate structures and marketing strategy, as outlined above. Their discussions were not limited to one particular area, but covered the gamut of the relationship between KTVY and Katz. In addition, Panos met with KTVY's customers in the New York area, primarily media buyers for advertising agencies, building good will and solidifying the seller-buyer relationship as well as soliciting future orders. Katz arranged the itineraries for these agency visits, and the particular Katz salesman whose responsibilities included servicing the agency involved would normally accompany Panos on the visit. In addition, in 1976 and 1978, several other KTVY employees made at least four other trips to New York for discussions with Katz.

As noted previously, MMT replaced Katz as KTVY's national advertising sales representative in August 1979. Plaintiff claims, and defendants do not dispute, that MMT has conducted its activities on KTVY's behalf since then in essentially the same manner as did Katz. The working relationship continues to be a close one, as evidenced by Panos's visits to New York in April and June 1980, for three and four days respectively, for discussions with MMT personnel and advertising agency customers. In addition, Panos and five other KTVY employees visited New York in December 1979 for discussions and consultations of the same

---

1. For purposes of clarity, the Court will refer only to KTVY throughout this Memorandum and Order. All such references will include, when appropriate, WKY.

2. *See* Notice of Motion, Exhibit B (filed Dec. 28, 1979) [the "1954 Agreement"].

3. Except with respect to commission rates, the substance of the 1954 Agreement was never altered.

4. *See* 1954 Agreement at 1, ¶ 4.

5. *See id.* at 2.

nature. Finally, MMT's responsibilities as KTVY's sales representative are set forth in an agreement executed in August 1979, which establishes the exclusive nature of MMT's solicitation efforts.[6] The agreement provides, moreover, that MMT "shall assist [KTVY] in the collection of delinquent accounts on advertising contracts solicited by [MMT]."[7]

The relationship between the Evening News and KTVY, Inc. is also a close one. In July 1975, the Evening News formed a subsidiary known as Channel 4, Inc. for the purpose of acquiring the assets of station KTVY. In November 1975, Channel 4, Inc. changed its name to KTVY, Inc. and in January 1976, KTVY, Inc. purchased the station. The boards of directors of KTVY, Inc. and the Evening News are identical and the main offices of both corporations are located at 615 Lafayette Boulevard in Detroit.[8] Despite this proximity, programing and sales decisions are made in Oklahoma City by KTVY personnel, who are employees of KTVY, Inc. The Evening News performs financial services for KTVY, such as overseeing the preparation of tax returns and reviewing pension and insurance programs.

Significantly, despite the close working relationship between KTVY's employees and Katz, Katz was never made aware of the existence of KTVY, Inc., and apparently assumed that the Evening News had itself purchased the station's assets in 1976. Indeed, when KTVY's general manager Lee Allan Smith wrote, on stationery bearing the legend "KTVY 4," to Katz's president James M. Greenwald in December 1978 to notify Katz of the termination of any agreements between the two, the letterhead contained no indication that the station was owned by KTVY, Inc., a separately incorporated entity.[9] Moreover, Peter A. Kizer, vice president in charge of the Evening News's Broadcast Division, wrote to Katz on July 11, 1979 to advise it formally that KTVY intended to change its national sales representative to MMT.[10] In the letter, Kizer, on behalf of the Evening News, expresses his appreciation for the job that Katz had done over the years. The letter indicates that a copy was sent to Smith, at "KTVY" not "KTVY, Inc." Furthermore, on August 21, 1979, Kizer again communicated with Katz, this time by telegram:

Further to my letter dated July 11, 1979, this shall confirm that MMT Sales, Inc., shall commence acting as *our* Sales Representative *for* Station KTVY effective the start of business August 27, 1979. You are hereby notified that your authority to act on *our* behalf is terminated effective with the close of business August 24, 1979.

We have instructed *our* Station to accept sales orders only from MMT and to advise *our* advertisers that MMT is *our* sole representative as of August 27, 1979.

Although we look forward to settling any claims or liabilities among *us* in the immediate future, we will hold you fully accountable for any damages which we may directly or indirectly incur as a consequence of your failure to follow this directive and *our* earlier notification.[11]

Kizer signed the telegram as an official of the Evening News, not as an official of KTVY, Inc., and a copy was sent to Smith as an official of "KTVY" rather than "KTVY, Inc."

Further evidence of the relationship between the Evening News and KTVY, Inc. may be found in two 1979 agreements with

---

6. *See* Supplemental Affidavit of David Fleischer, Exhibit A (filed Mar. 25, 1981).

7. *Id.*, ¶ 2(c).

8. Neither defendant has any offices, employees, real or personal property or bank accounts in New York, and they are not qualified to do business here. None of the six radio and television stations and three newspapers owned by the Evening News, either directly or through subsidiaries like KTVY, Inc., are located in New York.

9. *See* Notice of Motion, Exhibit E (filed Mar. 9, 1981).

10. *See* Supplemental Affidavit of Richard D. Mendelson, Exhibit C (filed Mar. 23, 1981).

11. *Id.*, Exhibit D (emphasis added).

MMT. *First,* the preamble of the August 1979 representation agreement recites that it is an "AGREEMENT made by and between MMT Sales, Inc. . . . and The Evening News Association . . ., licensee of Station KTVY. . . ."[12] The agreement is signed by representatives of MMT, the Evening News, and "Station KTVY." *Second,* in a document executed November 7, 1979, six days after the instant litigation was commenced, MMT agreed to indemnify the Evening News with respect to any claims arising from the "termination of The Evening News Association's national sales representative agreement regarding Station KTVY. . . ."[13] The document also provides that it is to be considered "in effect as of the date of execution of the MMT Sales, Inc.—Evening News Association Sales Representative Agreement."[14] The document makes no mention of KTVY, Inc. and it is signed by representatives of MMT and the Evening News only. Finally, in a recent deposition, MMT's president, Gary Scollard, testified that he had never heard of an entity known as KTVY, Inc.

## DISCUSSION

### Personal Jurisdiction

In opposition to defendants' motion to dismiss, plaintiff contends that KTVY, Inc. is doing business in New York and is therefore "present" for jurisdictional purposes pursuant to N.Y. C.P.L.R. § 301 (McKinney 1972).[15] Plaintiff argues further that the Evening News is also "present" in New York because it exercises such complete control over its KTVY, Inc. subsidiary that KTVY, Inc. is merely a department of the Evening News. The Court agrees with both propositions and accordingly denies defendants' motion.

The relevant case law in New York with respect to the concept of "doing business" under section 301 is at the same time clear in principle and obscure in application. The essential rule has remained unchanged since 1917. To do business in New York, a corporation must be here "not occasionally or casually, but with a fair measure of permanence and continuity." *Tauza v. Susquehanna Coal Co.,* 220 N.Y. 259, 267, 115 N.E. 915 (1917); *accord, Pneuma-Flo Systems, Inc. v. Universal Machinery Corp.,* 458 F.Supp. 858 (S.D.N.Y.1978). Moreover, the mere solicitation of business by an entity in New York for a foreign corporation is not sufficient to find that the latter is doing business. *Frummer v. Hilton Hotels International, Inc.,* 19 N.Y.2d 533, 536, 281 N.Y.S.2d 41, 43, 227 N.E.2d 851, 853, *cert. denied,* 389 U.S. 923, 88 S.Ct. 241, 19 L.Ed.2d 266 (1967). Substantial solicitation plus "very little more," however, will support such a finding. *Aquascutum of London, Inc. v. S.S. American Champion,* 426 F.2d 205, 211 (2d Cir. 1970). As Judge Friendly points out, the requisite "plus" may be satisfied by evidence of the defendant foreign corporation's "financial or commercial dealings in New York, or the defendant's holding himself out as operating in New York." *Id.* at 212 (citations omitted).

It is self-evident under these decisions that a doing business determination is unique to each case, requiring a careful consideration of all the facts and circumstances without relying too heavily on any one factor. Although this case is a close one, the Court concludes that KTVY, Inc. is doing business in New York. Katz's activities on KTVY's behalf over the years and MMT's activities at present demonstrate that the degree of solicitation is both substantial and systematic, most importantly

---

**12.** Supplemental Affidavit of David Fleischer, Exhibit A (filed Mar. 25, 1981).

**13.** *Id.,* Exhibit B.

**14.** *Id.*

**15.** Plaintiff also contends that defendants are subject to personal jurisdiction under N.Y. C.P.

L.R. § 302(a)(1) (McKinney Supp.1980) since its cause of action arises from a transaction of business by KTVY, Inc. in New York. The Court's disposition of defendants' motion under C.P.L.R. § 301 makes consideration of this contention unnecessary.

because their activities in New York regularly generated a substantial portion of the station's advertising revenues. In addition, Katz had the power to bill and collect for all advertising it solicited and MMT is required to assist KTVY in the collection of delinquent accounts. Moreover, officials of KTVY, Inc., from both top and lesser management, have visited New York regularly in recent years to consult with Katz and MMT personnel. Although these visits have been relatively few, it is not the number but their nature and quality that the Court finds important. In this case, the visits played an important role in KTVY's overall sales efforts. Both Katz and MMT have had significant input in the development of the station's rate structure and sales strategy, which was facilitated by the face-to-face meetings. Also, while in New York, KTVY personnel visited customers both to solidify ongoing relationships and to solicit future business. Indeed, a further indication that the efforts of Katz and MMT have exceeded "mere solicitation" is that they arranged the itineraries for and accompanied the KTVY personnel to these agency visits. In sum, KTVY, Inc. has "engaged in such a continuous and systemative course of 'doing business' here as to warrant a finding of its 'presence' in this jurisdiction." *Simonson v. International Bank*, 14 N.Y.2d 281, 285, 251 N.Y.S.2d 433, 436, 200 N.E.2d 427, 429 (1964), *quoted in Frummer v. Hilton Hotels International, Inc., supra*, 19 N.Y.2d at 536, 281 N.Y.S.2d at 43, 227 N.E.2d at 853; *see Bryant v. Finnish National Airline*, 15 N.Y.2d 426, 430, 260 N.Y.S.2d 625, 627, 208 N.E.2d 439, 440 (1965); *Elish v. St. Louis Southwestern Ry. Co.*, 305 N.Y. 267, 268, 112 N.E.2d 842 (1953).

■ Having determined that KTVY, Inc. is "present" in New York, the next question is whether its acts can be attributed to its parent corporation, the Evening News, such that the latter is also doing business in New York. The relevant standard was most recently stated by the New York Court of Appeals in *Delagi v. Volkswagenwerk AG*, 29 N.Y.2d 426, 328 N.Y.S.2d 653, 278 N.E.2d 895 (1972). Where a wholly-owned subsidi-

ary is present in New York, a New York court may exercise personal jurisdiction over the parent if the latter's "control over the subsidiary's activities [is] so complete that the subsidiary is, in fact, merely a department of the parent." *Id.* at 432, 328 N.Y.S.2d at 657, 278 N.E.2d at 897; *see Public Administrator v. Royal Bank*, 19 N.Y.2d 127, 132, 278 N.Y.S.2d 378, 382, 224 N.E.2d 877, 879 (1967); *Taca International Airlines, S.A. v. Rolls-Royce of England, Ltd.*, 15 N.Y.2d 97, 102, 256 N.Y.S.2d 129, 132, 204 N.E.2d 329, 331 (1965). The rationale underlying this rule is aptly summarized by Dean McLaughlin: "Where the corporate distinction between the two firms is purely formal and the foreign corporation totally dominates the New York corporation, treating the latter as a mere incorporated division of the parent, a court is entitled to treat the two corporations as one." McLaughlin, *Practice Commentaries*, C301:3 (1972) (McKinney Supp.1980).

Dean McLaughlin's focus on the parent's "treating the [subsidiary] as a mere ... division" is especially relevant herein. The Court does not take issue with defendants' characterization of KTVY, Inc. as a separate entity with its own employees and assets. But defendants' present characterization of KTVY, Inc. in no way diminishes the importance of their prior *treatment* of KTVY as nothing more than a division or department of the Evening News before, during and after the events precipitating this lawsuit.

■ The Court is particularly impressed by the July and August 1979 correspondence from the Evening News's vice president in charge of broadcasting, Peter A. Kizer, to Katz to the effect that Katz was being terminated and replaced on August 27, 1979 by MMT as *the Evening News's* sales representative for *its* station, not as *KTVY, Inc.'s* sales representative for *its* station. The import of this correspondence was clear then as to the Evening News's treatment of KTVY and it is no less clear today. Indeed, despite defendants' contention that the knowledge, or lack thereof, of

Katz and MMT as to the separate existence of KTVY, Inc. is irrelevant to the issue of jurisdiction, clearly their lack of knowledge was and is the direct result of the Evening News's treating its subsidiary as a division in the eyes of the public rather than as a separate, albeit affiliated, corporation. Thus, their lack of knowledge is hardly irrelevant to the jurisdictional issue since it is another indication of the Evening News's treatment and domination of the KTVY, Inc. in matters of importance.

The character of this relationship is further clarified by the August 1979 representation agreement and the November 1979 indemnification agreement between the Evening News and MMT. Certainly if KTVY, Inc. had any separate existence apart from the mere formality of the parent-subsidiary relationship, it would have been at least acknowledged in these agreements. It was not, and the Court is compelled to conclude that KTVY, Inc. is the "mere department" of the Evening News for jurisdictional purposes. Hence, the Evening News is doing business in New York and subject to personal jurisdiction in this Court.

*Attachment*

■ Contrary to plaintiff's contention, an attachment under New York law solely for security purposes [16] is appropriate only when it appears likely that a plaintiff will have difficulty enforcing a judgment. In any event, a plaintiff is never entitled to an attachment as a matter of right. Rather, the remedy is discretionary with the Court and should be used sparingly. *See generally* 7A J. Weinstein, H. Korn & A. Miller, *New York Civil Practice*, ¶¶ 6201.01–6201.08. "Thus, if jurisdiction over the defendant can be secured without attaching his property and there is no reason to believe that the defendant will not satisfy any judgment entered against him, an order of attachment should be withheld." *Id.,* ¶ 6201.03, at 62–8 (footnote omitted); *see* Annotation, N.Y. C.P.L.R. § 6201, "Legislative Studies and Reports," at 15 (McKinney 1980).

■ In light of the disposition of defendants' motion to dismiss, plaintiff has secured jurisdiction. Since there is every reason to believe the defendants will satisfy any adverse judgment, should that become necessary, there is no need for an attachment. According to the Evening News's vice president, the Evening News has assets in excess of $100 million and KTVY, Inc. has assets in excess of $40 million.[17] Plaintiff has not disputed these estimates and the Court accepts them as true. Moreover, MMT has agreed to indemnify the Evening News for any loss incurred in this litigation, and MMT's president has expressly represented to the Court that his company "stand[s] behind" defendants for any obligation arising therefrom.[18] Although MMT is not a party and therefore would not be bound by a judgment rendered against defendants, the Court finds that the indemnity agreement is at least another factor obviating the need for an attachment. Plaintiff has given no reason, beyond the fact that defendants are foreign corporations, why it fears a judgment will not be paid. The Court concludes that this fact alone is insufficient to justify an attachment under the circumstances of this case.[19]

## CONCLUSION

In light of the foregoing, plaintiff's motion for an order of attachment, Fed.R. Civ.P. 64; N.Y. C.P.L.R. § 6201, and defendants' motion to dismiss the amended complaint for lack of personal jurisdiction, Fed.R.Civ.P. 12(b)(2), are denied.

---

16. An attachment may also be sought to secure jurisdiction over a defendant, but plaintiff has sought the instant attachment only to provide security for the satisfaction of a prospective judgment.

17. *See* Affidavit of Peter Kizer, ¶ 5 (filed Mar. 25, 1981).

18. Affidavit of Gary Scollard, ¶ 2 (filed Mar. 25, 1981).

19. The Court questions plaintiff's good faith in bringing this motion for attachment sixteen months after it commenced the action, since the only reason advanced in support of the motion was known to it when the action was commenced.

The parties are directed expeditiously to complete discovery. Magistrate Washington is authorized to continue supervising discovery and to resolve any outstanding and future discovery disputes.

SO ORDERED.