**KATZ COMMUNICATIONS, INC.,**
Plaintiff-Appellee,

v.

**The EVENING NEWS ASSOCIATION and KTVY, Inc.,**
Defendants-Appellants.

**No. 514, Docket 82–7509.**

United States Court of Appeals, Second Circuit.

Argued Dec. 17, 1982.

Decided April 1, 1983.

Peter N. Wang, New York City (Friedman & Gass, P.C., and Bell, Kalnick, Beckman, Klee & Green, New York City, on brief), for defendants-appellants.

David Fleischer, New York City (Charles Burton, W. Bruce Johnson, and Battle, Fowler, Jaffin & Kheel, New York City, on brief), for plaintiff-appellee.

Before FRIENDLY and NEWMAN, Circuit Judges, and WYZANSKI, Senior District Judge.*

WYZANSKI, Senior District Judge.

The principal questions presented in this diversity jurisdiction case are whether KTVY, Inc. and The Evening News Association ["Evening News"] were "doing business" in New York State so as to be subject to personal jurisdiction under § 301 of the New York Civil Practice Law and, if so, whether the damages for breach of contract were erroneously calculated by the district court, 514 F.Supp. 423.

Katz Communications, Inc. ["Katz"], a Delaware corporation, brought in the United States District Court a non-jury action for breach of contract against Evening News and its wholly-owned subsidiary, KTVY, Inc., both being Michigan corporations. The findings of the district court and other undisputed facts are to the following effect.

On June 23, 1954 Katz and WKY Radiophone Co. executed a written contract mak-

---

* United States District Judge for the District of    Massachusetts, sitting by designation.

ing Katz the exclusive national advertising representative for WKY's radio and television stations in Oklahoma City. The agreement provided that it could be "cancelled at any time by either party, on one year's written notice."

During the following two decades and more the parties left the contract unchanged except from time to time to make amendments altering commission rates.

On July 14, 1975, Evening News purchased station WKY from the corporation originally known as WKY Radiophone Co., and simultaneously became subject to the obligations of, and entitled to the rights of, the seller under its contract with Katz. Six months later Evening News assigned its rights under that contract to its wholly-owned subsidiary, KTVY, Inc., but this assignment was unknown to Katz which first learned of the corporate existence of KTVY, Inc. after this action began.

Evening News and its wholly-owned subsidiary, KTVY, Inc., have their principal offices in Detroit premises which they share. Parent and subsidiary have identical boards of directors. Although the subsidiary retains final authority over programming and advertising sales by station KTVY, the parent performs for the subsidiary preparation of tax returns, review of pension and insurance matters, and like financial services.

In performing the 1954 contract, Katz solicited advertising principally in New York, but to some extent in other parts of the United States. Between 1976 and 1979 about one third of KTVY, Inc.'s revenues from national advertising—that is, several million dollars in revenue—was derived from advertising solicited by Katz in the New York market and resulting from plans, strategies and tactics which appellants' representatives discussed regularly (although not exclusively) in New York with Katz's representatives.

During the quarter of a century that Katz was the exclusive national advertising representative for the station now known as KTVY, Katz and the officers and employees of the successive proprietors of that station had a close working relationship. Final authority to accept advertising orders was exercised by the station's proprietors, but Katz guaranteed the advertisers' orders, billed the advertisers, and collected from them. Katz and the station's proprietors jointly developed the station's marketing philosophy, strategy, techniques, and structure. They did this, *inter alia,* during periodic visits to New York by the station's representatives. In that connection, U. Nick Panos, KTVY's national sales manager, came to New York twice in 1976, twice in 1977, once in 1978, and once in 1979. During those visits he met not only employees of Katz, but also the advertising clients. Other KTVY employees made at least four similar trips in 1976 and 1978.

On December 19, 1978 an officer of KTVY, Inc., without referring to the name of the subsidiary, notified Katz of its cancellation of the contract, effective one year after the notice. On July 11, 1979 Evening News notified Katz that the contract was terminated as of August 27, 1979. On August 21, 1979 Evening News informed Katz that the latter's authority to act for KTVY would cease on August 24.

Katz vainly sought to persuade the proprietors of KTVY to reconsider the termination decision. Then Katz succeeded in getting for stations not located in Oklahoma City five advertising agency contracts in 1979 and an additional one, located in Oklahoma City, in 1980.

Katz, which was the advertising representative for more than 100 other television stations, did not, either because of the loss of the KTVY contract or for any other reason, reduce the size of its staff in 1979. No single employee of Katz, nor any group of such employees, had spent a significant amount of his individual time working specifically on the KTVY station account.

The district court expressly found that when the KTVY agreement was cancelled, Katz was unable to reduce its work force on that account. The court impliedly found that if there had been no cancellation of the KTVY contract, Katz, *without increasing*

*its staff* or incurring additional overhead expenses or indirect or fixed costs, would have been able to perform its obligations under the five new 1979 contracts.[1] Furthermore, the district court expressly found that the only appreciable savings made by Katz as a result of being relieved of performing services for station KTVY in the period from August 27, 1979 through December 18, 1979 were the monthly Telex costs, amounting to about $640.

During the twelve months preceding the cancellation, the proprietors of KTVY paid to Katz an average monthly commission of $28,408.

In 1979 orders for broadcasting were solicited 60 to 90 days in advance of the station's performance. In that light, the district court found that it would be appropriate to calculate damages by taking into account KTVY's actual receipts from national advertising beginning September 1, 1979 (some seven days after cancellation of the Katz contract took effect) through February 29, 1980 (some two months and thirteen days beyond one year after the Katz contract was, under its provisions, terminable).

KTVY's total national advertising revenue from September 1, 1979 through February 29, 1980 was $2,486,461.36. Inasmuch as the contract commission rate was 7½%, the court allowed Katz a recovery of $186,484.60 less the $640 which Katz saved by not having to pay Telex fees, or $185,844.60.

■ The first major question presented on appeal is whether the district court (applying the New York rule which, as the parties properly concede, governs this diversity jurisdiction case) correctly concluded that the subsidiary, KTVY, Inc., and the parent, Evening News, were "doing business" in New York so as to satisfy the tests which are implied by New York Civil Practice Act § 301 which provides: "A court may exercise such jurisdiction over persons, property, or status as might have been exercised heretofore."

Obviously we are dealing with a question of state statutory law, not of New York's constitutional power under the "due process" clause of the Fourteenth Amendment to the United States Constitution—a point not raised nor even doubted by counsel or this court. *See McGee v. International Life Ins. Co.,* 355 U.S. 220, 223, 78 S.Ct. 199, 201, 2 L.Ed.2d 223 (1957); *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945).

It is often loosely said, as though it were a rule enunciated in the text of the statute, that under the New York state law jurisdiction over a foreign corporation may not be founded on mere solicitation of business within New York. We do not agree that in New York by statute or decision the rule is as inflexible as that statement indicates. In the days of the giants of the law the approach was surely not so absolute. Shortly after he joined the New York Court of Appeals, Cardozo J., on behalf of a notably strong court, including Chief Justice Hiscock and Judge Cuthbert Pound, wrote the opinion in *Tauza v. Susquehanna Coal Co.,* 220 N.Y. 259, 115 N.E. 915 (1917), holding that a Pennsylvania corporation, maintaining an office in New York under the direction of a sales agent, with salesmen and clerical assistance, and using those agents to systematically and regularly solicit orders (subject to confirmation in Pennsylvania) for continuous shipments of coal from Pennsylvania to New York was "doing

---

1. That factual finding implies that the five contracts were not "substitute" contracts, as the term "substitute" is used in connection with a "lost volume seller" in the law of damages. Restatement (Second) Contracts § 350, Comment d (1981). *See also Teradyne, Inc. v. Teledyne Industries, Inc.,* 676 F.2d 865, 868 n. 4 (1st Cir.1982); Restatement (Second) Contracts § 347, Comment f (1981). A "substitute" is a contract which a volume seller who has suffered the loss of one contract through the breach of another party has entered into in place of the broken contract and which the volume seller would not have been able, with his existing personnel and overhead costs, to perform had there been no breach.

The 1980 contract is irrelevant because its time of performance occurred after December 18, 1979, the appropriate termination date for the contract for breach of which this suit was brought.

business" within New York, as contemplated by the then Code of Civil Procedure § 1780, subdivision 4, and was therefore subject to service of process in New York. The Pennsylvania Coal Company which in Judge Cardozo's opinion was subject to service of process in New York (on what happened to be a cause of action not related to New York business) did not perform in New York any activities of greater jurisdictional significance than were performed in the case at bar by KTVY, Inc. and Evening News directly as well as through their New York agent, Katz.

The teaching of Judge Cardozo was accepted as canonical by a distinguished panel of this court consisting of Judges Learned Hand, Swan and Augustus N. Hand adjudicating *Hutchinson v. Chase & Gilbert, Inc.,* 45 F.2d 139 (2d Cir.1930). In reviewing the New York State authorities, Judge Learned Hand, as spokesman for our then bench, stated:

... it is ... hard to judge what dealings make it just to subject a foreign corporation to local suit...

Possibly the maintenance of a regular agency for the solicitation of business will do... In *Tauza v. Susquehanna Coal Co., supra,* there was no more, but the business was continuous and substantial.... (p. 141)

In cases involving solicitation by a foreign corporation, courts determining questions of jurisdiction have been far more particularistic than has sometimes been perceived. The New York courts have examined *ad hoc* the realities of the business done by a foreign corporation to determine whether, in the words of Judge Learned Hand (Ibid., at 142), there is "a good reason for drawing the defendant into a suit away from its home state." *See Miller v. Surf Properties,* 4 N.Y.2d 475, 176 N.Y.S.2d 318, 151 N.E.2d 874 (1958); *Frummer v. Hilton Hotels International, Inc.,* 19 N.Y.2d 533, 536, 281 N.Y.S.2d 41, 43, 227 N.E.2d 851, *cert. den.* 389 U.S. 923, 88 S.Ct. 241, 19 L.Ed.2d 266 (1967); *Laufer v. Ostrow,* 55 N.Y.2d 305, 449 N.Y.S.2d 456, 459, 434 N.E.2d 692, 694 (1982); *Katz Agency, Inc.*

*v. Heftel Broadcasting Corp.,* 56 A.D.2d 758, 392 N.Y.S.2d 39 (1st Dept.1977); *Gelfand v. Tanner Motors Ltd.,* 385 F.2d 116 (2d Cir. 1967). Our own decision in *Aquascutum of London, Inc. v. S.S. American Champion,* 426 F.2d 205, 211 (2d Cir.1970) does not repudiate or impugn the attitudes manifested by Cardozo, J., Hiscock C.J., Cuthbert Pound J., and the other members of the 1917 New York Court of Appeals nor of what in the 1930's was often called "Judge Learned Hand's court."

The facts of *Aquascutum* (the case upon which at our bar the defendants-appellants so heavily relied) did not appear to the panel which decided that case to involve the equivalent of what in *Tauza v. Susquehanna Coal Co.* Judge Cardozo called "an office in this state under the direction of a sales agent, with eight salesmen, and with clerical assistance" through whom the defendant foreign corporation "systematically and regularly solicits and obtains orders which result in continuous shipments from Pennsylvania to New York." 220 N.Y. at 265, 115 N.E. at 917.

We are mindful that in *Susquehanna* the sales agency in New York consisted of the foreign corporation's *own* employees while in the case at bar the office in New York was maintained by an independent contractor operating through *its* employees. However, in the case at bar the Oklahoma employees of the defendants came to New York to participate directly with the Katz employees in the regular and systematic solicitation of customers and the planning of the national advertising program of the plaintiffs; thus, as we have already said, the Katz office was made virtually a division of the defendant's business. Under these circumstances the district court could properly have regarded, as we do, the Katz office as not a mere independent contractor but, in the words of Judge Cardozo, "the defendant's agent," [220 N.Y. at 269, 115 N.E. at 918, col. 1, line 36], or, in the words of Judge Learned Hand, "a regular agency for the solicitation of business," [45 F.2d at 141, col. 2, second full paragraph].

There is no reason for us to reach with respect to jurisdiction different results with respect to KTVY, Inc. and Evening News. The district court made no error in concluding that Evening News operated its wholly-owned subsidiary, KTVY, Inc., as a department of its own business. What underlines that conclusion is that the cancellation of the Katz contract, the very breach which led to this lawsuit, was effectuated by the communications sent by Evening New's officer, not KTVY, Inc.'s officer. Hence Evening News, no less than KTVY, Inc., was subject to personal jurisdiction by virtue of Civ.Prac.Law § 301.

As we said at the outset, no one has suggested, nor could anyone reasonably suggest, that such subjection of either corporation is a denial of the due process guaranteed by the Fourteenth Amendment to the United States Constitution. *See McGee v. International Life Ins. Co.* and *International Shoe Co. v. Washington,* both *supra.*

In sum, we hold that the district court properly found that under N.Y.Civ. Prac.Law § 301 it had personal jurisdiction over both KTVY, Inc. and its parent, Evening News, which owned all the stock of KTVY, Inc., because each of those two corporations was "doing business" in New York inasmuch as not merely its agent was systematically and regularly soliciting business, in large amounts, in New York, but its own representatives were in New York planning and executing the tactics and strategy for getting advertising contracts not merely in New York but throughout the nation. Indeed that part of KTVY's revenues from the national market which originated from plans, strategy, and tactics developed in New York amounted to approximately two million dollars a year.

We turn to the merits of the case.

■ There is no force in appellants' contention that the parties had abandoned prior to 1979 the 1954 contract. To be sure, from time to time after 1954 the parties by agreement changed the commission rate for Katz's services. But the district court in light of all the circumstances found that the contract, as thus amended, continued. The

issue was purely factual. *Matter of Estate of Rothko,* 43 N.Y.2d 305, 324, 401 N.Y.S.2d 449, 457, 372 N.E.2d 291, 299 (1971). Since the court's finding was not clearly erroneous, the parties and we are bound by it. Fed.R.Civ.P. 52(a).

■ Appellants' argument that the court erred in calculating Katz's damages by basing them on a percentage of revenues received by station KTVY from September 1, 1979 through December 18, 1979 and a spill period of 13 days and 2 months thereafter misconceives the problem faced by the plaintiff and by the court as a consequence of appellants' wrongful conduct. What the district court had to decide was what net profits the plaintiff Katz would have earned had the contract been performed: that is, to measure what Katz would have netted, after deductions, from commissions due for advertising which would have been procured in the period from August 24, 1979 through December 18, 1979 had there been no breach. While we can see plausible arguments against the district court's use of the earnings of Katz's successor during the period from September 1, 1979 through February 1980, we do not regard as unreasonable the district judge's choice of that method of calculating damages. His method was permissible in light of the following New York rule recently declared in *Matter of Estate of Rothko, supra,* 43 N.Y.2d at 323, 401 N.Y.S.2d at 457, 372 N.E.2d at 298–99 (citation omitted):

 . . . [S]o long as the figure arrived at had a reasonable basis of computation and was not merely speculative, possible or imaginary, the [court] had the right to resort to reasonable conjectures and probable estimates and to make the best approximation possible through the exercise of good judgment and common sense in arriving at that amount . . . This is particularly so where the conduct of wrongdoers has rendered it difficult to ascertain the damages suffered with the precision otherwise possible.

■ Appellants' next point is that the district court erred in its findings as to

Katz's efforts to minimize damages once it had been informed of appellants' breach. No doubt, Katz's right to recover damages depends on its "reasonable exertions to render the injury as light as possible." *Hamilton v. McPherson,* 28 N.Y. 72, 77 (1863); *Wilmot v. State of New York,* 32 N.Y.2d 164, 344 N.Y.S.2d 350, 353, 297 N.E.2d 90, 92 (1973). However, Katz had no opportunity before June 1980 to undertake a "substitute" [2] contract appointing it an advertising representative for a station located in Oklahoma City. The ability of Katz in 1979 to secure contracts to act as advertising agent for stations located elsewhere is irrelevant, because such contracts would have been available to, and could have been performed by, Katz without additional expenditure for staff and like overhead expenses had there been no breach of plaintiffs of the KTVY contract. The evidence is clear that the new markets penetrated by Katz in the fall of 1979 were not "substitutes" for the KTVY contract but constituted *additional volume* involving no new indirect or fixed costs. As what is now conventionally called a "lost volume seller," Katz's recovery from appellants is not subject to reduction of otherwise recoverable damages on account of the revenues it received from the five new clients it procured in 1979. *Neri v. Retail Marine Co.,* 30 N.Y.2d 393, 399–400 & n. 2, 334 N.Y.S.2d 165, 169–70 & n. 2, 285 N.E.2d 311, 314 & n. 2 (1972); *Teradyne, Inc. v. Teledyne Industries, Inc.,* 676 F.2d 865, 868 nn. 2, 3 & 4 (1st Cir.1982); Restatement (Second) Contracts § 347 Comment f, § 350 Comment d (1981); 5 Corbin, Contracts § 1039, at 246–47 (1951).

■ Nor is there merit in appellants' contention that Katz's recoverable damages should be diminished by the amount of salaries, wages, and other overhead or indirect or fixed costs which Katz, in appellants' view, could have saved once it was apprised of the appellants' breach. Admittedly, there is little, if any, relevant evidence on this point in the record. However, the burden is on the appellants to prove any potential item in mitigation of damages inasmuch

as it is *pro tanto* a defense to the claim of the wronged party. *Jenkins v. Etlinger,* 55 N.Y.2d 35, 39, 447 N.Y.S.2d 696, 698, 432 N.E.2d 589, 591 (1982); *Cornell v. Development Corp.,* 17 N.Y.2d 69, 74, 268 N.Y.S.2d 29, 33, 215 N.E.2d 349, 352 (1966). In any event, regardless of where the burden of proof lies, we agree with the lower court that Katz could not lighten its overhead costs in the brief period *after* it received the August 21, 1979 notice of immediate cancellation—which was the first time that it was aware of an impending breach (as distinguished from a permissible termination on one year's notice) of the agency contract—and *before* the permissible December 18, 1979 termination of the contract. Even if an employee could lawfully have been dismissed before December 18, 1979 by a notice given August 21, 1979 or thereafter, it was not unreasonable for Katz to keep the employee either in the hope that appellants could be persuaded to change their minds, or that Katz, as a "lost volume seller," could find new customers. Moreover, we are not persuaded that when a customer or client breaks a contract with an advertising or like professional organization, the wrongdoer may successfully contend that the damages suffered by the wronged party should be diminished if the wronged party does not forthwith at least partially dismantle the organization he has created and thus disable himself from promptly and fully responding to potential opportunities in the near future. Nor are we unmindful that one consequence of our adoption of the appellants' contention would be that hereafter employees or organizations like Katz's would in all likelihood be, in situations such as the one at bar, the undeserved victims of a precipitate determination to discharge them. The wrongdoer's interest in prompt mitigation of damages is of no greater public concern than is the innocent worker's interest in avoiding becoming one of the army of unemployed.

■ Moreover, here the district court has found that the appellants are not entitled to

---

**2.** See footnote 1, *supra.*

a deduction from otherwise recoverable damages of any part of the salaries of officers and employees. Under New York law, such a determination is a finding of fact to be sustained if, as in the case at bar, the officers and employees "are needed to fulfill the plaintiff's other contracts." *R & I Electronics, Inc. v. Neuman,* 66 A.D.2d 836, 838, 411 N.Y.S.2d 401, 405 (2d Dept.1978), *see appeal after remand* 81 A.D.2d 832, 438 N.Y.S.2d 832 (2d Dept.1981).

What we have said about not deducting employee's salaries from otherwise recoverable damages applies *pari passu* to the issue of deducting insurance, rental, and other non-variable costs from otherwise recoverable damages.

The district court found that the evidence did not clearly show what, if anything, Katz saved in costs of travel of its employees in going to Oklahoma City and elsewhere for business connected with appellants. Burden of proof problems aside, we are content to note that if the district court committed error—which we doubt—it is *de minimis.*

Appellants' assignment of error based on the district court's refusal to allow their counsel to use a tape recording to impeach one of plaintiff's witnesses does not deserve prolonged attention. Our examination of the tape leads us to conclude that the district court's ruling was not an abuse of discretion and was not, in any event, prejudicial.

*Affirmed.*