**ULLMAN–BRIGGS, INC., Plaintiff,**

v.

**SALTON, INC., Defendant.**

**No. 87 Civ. 0594 (JES).**

United States District Court,
S.D. New York.

Jan. 18, 1991.

Robinson Brog Leinwand Reich Genovese & Gluck, P.C. (Jefferey W. Herman, of counsel), New York City, for plaintiff.

Shaw, Licitra, Esernio & Schwartz, P.C. (Harry Glick, of counsel), Garden City, N.Y., for defendant.

1. The manufacturers that Ullman–Briggs represented are referred to in the testimony as "lines." A line is a supplier, whose products Ullman–Briggs sold on a commission basis to

## OPINION AND ORDER

SPRIZZO, District Judge:

Plaintiff, Ullman–Briggs, Inc. ("Ullman–Briggs"), brings this action against the defendant, Salton, Inc. ("Salton"), alleging breach of contract. The Court held a bench trial on liability on July 17, 18, and 21, 1989, and received post-trial briefs and heard closing statements on November 15, 1989, at which time the Court announced its findings on liability. Specifically, the Court found Salton liable for breach of contract and ordered a trial on damages. The damages trial was held on May 31, 1990. The Court then accepted post-trial briefs, proposed findings of fact, and heard closing statements on the damages issue. This Opinion and Order constitutes the Court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52.

## FACTS

At the times relevant to this action, Ullman–Briggs was a manufacturer's representation company that was formed in January of 1985. See Transcript of Liability Trial ("7/89 Tr.") at 65. The two principals of the company were Dick Ullman and Charles Briggs. See 7/89 Tr. at 65. Ullman–Briggs was paid commissions on sales of products from manufacturers that it represented.[1] See 7/89 Tr. at 66. It solicited orders from any merchants to whom its clients were willing to sell their products. These typically included department stores, specialty stores, distributors, and discounters. See 7/89 Tr. at 68. Ullman–Briggs also had a special relationship with J.C. Penney, whose account was personally managed by Charles Briggs. See 7/89 Tr. at 66, 69–71; Transcript of Damages Trial ("5/90 Tr.") at 18–19.

Salton, Inc. ("Salton") was a company that was engaged in the manufacture and distribution of small electrical appliances. See 7/89 Tr. at 15. Alvin Finesman was the president of Salton from 1983 to 1985 when the company was bought by Sevko,

"accounts," who were merchants who resold the product to either other dealers or consumers. See Transcript of Damages Trial ("5/90 Tr.") at 10.

Inc. ("Sevko") whose president and CEO was David Sabin. *See* 7/89 Tr. at 14, 62, 305. Finesman had attempted to buy the company. However, he was unsuccessful in doing so and, after Sevko took over the company, he was fired. *See* 7/89 Tr. at 62, 305. Finesman did not recall when Sevko bought the company or when he was fired, but he stated that it was after August 5, 1985. *See* 7/89 Tr. at 39–40.

Salton sold small electrical kitchen appliances such as hot trays, coffee makers, yogurt makers, and battery-operated shower radios known as "Wet Tunes." *See* 7/89 Tr. at 19. "Wet Tunes" had a tremendous amount of potential in 1985 and ended up being one of the most successful items sold in the housewares business in the last five years. *See* 7/89 Tr. at 181.

Prior to 1985, Salton had been represented by Dick Ullman, who at that time was a principal of the Cue Group, a representation firm headed by Ullman and Sam Carson. *See* 7/89 Tr. at 28–30. This relationship stemmed from the fact that Ullman and Finesman were personal friends and former business associates. *See* 7/89 Tr. at 23, 46. In fact, it was Dick Ullman who had introduced Salton to Andrew Mark, the inventor of "Wet Tunes," which paved the way for the licensing agreement that Salton now has with Mr. Mark. *See* 7/89 Tr. at 26–30, 179–181.

In January of 1985, after Ullman left the Cue Group and joined Briggs to form Ullman–Briggs, Ullman–Briggs represented Salton. *See* 7/89 Tr. at 3, 65–67. The parties' relationship was governed by an oral contract for eight months. *See* 7/89 Tr. at 32. During the time that Ullman–Briggs represented Salton, it was the most successful sales representative organization that Salton had. *See* 7/89 Tr. at 30–31.

On August 5, 1985 Salton and Ullman–Briggs entered into a written contract which provided that Ullman–Briggs would act as Salton's exclusive representative for New York, Philadelphia, Delaware, and Northern New Jersey for the next two years. *See* 7/89 Tr. at 32–34, 186; Plaintiff's Exhibit ("PX") 1. This contract was entered into by Alvin Finesman, who at that time was still the president of Salton. *See* 7/89 Tr. at 32–34; PX 1.

However, on September 25, 1985, after Sevko had bought the company and fired Finesman, Salton terminated its contract with Ullman–Briggs effective October 31, 1985, and hired Sam Carson, Inc. ("Sam Carson") as their representative. *See* 7/89 Tr. at 82–84, 271–273; PX 2.

On September 27, 1985, Mr. Briggs and Mr. Ullman met with Mr. Sabin and Mr. Elliot, principals of Sevko, to discuss the relationship between Ullman–Briggs and Salton.[2] *See* 7/89 Tr. at 38, 86. Although Ullman–Briggs' future relationship with Salton was discussed at this meeting, subsequent correspondence between the two companies indicates that there was some disagreement as to what the extent of such a future representation of Salton products by Ullman–Briggs would be. *See* 7/89 Tr. at 86–97; PX 3, 4, 5.

An attempt was made to clarify this confusion at a meeting on November 5, 1985 between Ullman, Briggs and Sabin at the National Housewares Show in Chicago, Illinois. *See* 7/89 Tr. at 100–102. Following this meeting, Sabin offered Ullman–Briggs a two-year contract as Salton's exclusive agent to J.C. Penney. *See* PX 6. The testimony of Mr. Briggs, which the Court finds credible, establishes that an agreement to act as an exclusive representative to only one store was less attractive to Ullman–Briggs than what was offered at the "hurricane meeting," and was certainly less attractive than the agreement to act as an exclusive distributor set forth in the original contract signed by Alvin Finesman. *See* 7/89 Tr. at 103. Nevertheless, Ullman–Briggs attempted to serve as Salton's representatives to J.C. Penney, but was prevented from adequately doing so by actions of Salton's employees. *See* 7/89 Tr. at 107–08.

**2.** This meeting is referred to at trial and in the parties' memoranda as the "hurricane meeting" because it took place during a hurricane. *See* 7/89 Tr. at 86.

Interestingly, during all of the time that these negotiations were taking place, neither Ullman nor Briggs asserted any rights under the two-year agreement signed by Finesman.[3] *See* 7/89 Tr. at 103–05, 190–94. They testified that they avoided mentioning that contract because they feared that if they did so Salton would refuse to deal with them and would not have paid commissions already owed to them. *See id.* at 103–05, 190–94. Also, they hoped that if the negotiations were successful, Ullman–Briggs could have avoided losses from the termination of the written agreement and therefore litigation would have been unnecessary. *See id.* at 103–05, 190–94. The Court accepts this explanation as credible.

The evidence introduced at the trial on damages established that Ullman–Briggs represented Salton for ten months and during that time earned $246,262.00 in commissions from the sale of Salton products. *See* 7/89 Tr. at 81; PX 23. In contrast to this amount, the evidence demonstrated that Sam Carson, Inc., the representative corporation that replaced Ullman–Briggs, earned only $260,000 over the 21 month period when it was Salton's representative. *See* PX 19.

After Salton terminated its contract with Ullman–Briggs, Ullman–Briggs took on 17 new lines that produced $151,433 in commissions over the next 21 months. *See* PX 23. As a result of these new lines, Ullman–Briggs incurred increases in travel, entertainment, telephone, postage and freight, and trade show expenses that totaled $23,993. *See* Defendant's Exhibit ("DX") 1.

## DISCUSSION

■ Based upon the aforesaid facts, which the Court finds to be established, the Court concludes that there was in fact a contract between Ullman–Briggs and Salton which was breached by defendant's termination of plaintiff. The Court finds that Alvin Finesman, as the president of the company at the time of the contract, had actual authority to enter into that contract. The corporate by-laws clearly gave Finesman broad authority to enter into contracts on behalf of the company.[4] Moreover, it is well-settled that the president of a corporation has the authority to enter into any necessary contract in the ordinary course of the company's business. *See, e.g., Scientific Holding Co. v. Plessey, Inc.*, 510 F.2d 15, 23–24 (2d Cir.1974); *American Express Co. v. Lopez*, 72 Misc.2d 648, 648, 340 N.Y.S.2d 82, 83 (Civ.Ct.N.Y.Co.1973); *Goldenberg v. Bartell Broadcasting Corp.*, 47 Misc.2d 105, 109, 262 N.Y.S.2d 274, 279 (Sup.Ct.1965).

Defendant's argument that this contract was so unusual or extraordinary that Finesman exceeded his authority in entering into it, *see Vig v. Deka Realty Corp.*, 143 A.D.2d 185, 187, 531 N.Y.S.2d 633, 634 (2nd Dept.1988); *Goldenberg, supra*, 47 Misc.2d at 109, 262 N.Y.S.2d at 279, is unpersuasive and must be rejected. This case is not analogous to cases, such as those relied upon by defendant, where the company's president sells the only asset the corporation owned, *see Vig, supra*, 143 A.D.2d at 186, 531 N.Y.S.2d at 634, or enters into an employment contract which provides for unusually large compensation in the form of the company's stock. *See Goldenberg, supra*, 47 Misc.2d at 109, 262 N.Y.S.2d at 279.

Moreover, there was evidence, which the Court finds credible, that a two-year written representation contract was not so unusual in the electronic appliances industry

---

**3.** Salton's representatives testified that they were aware of the contract's existence at least as of late September or early October. *See* 7/89 Tr. at 271–73, 310–15.

**4.** Section 2 of Article IV of Salton's By–Laws provided:

The President shall be the chief executive officer of the Corporation and, under the direction of the Board of Directors, shall have general management and direction and super-

intendence of the properties and affairs of the Corporation.

Section 5 of Article V of the By–Laws further provided that:

Except as otherwise prescribed by the Board of Directors, the President, any Vice President or Secretary shall sign and execute all contracts, instruments and documents in the name of the Corporation.

that Finesman clearly lacked authority to make it. *See* 7/89 Tr. at 37–38. Therefore, the Court rejects defendant's argument that the very nature of the contract was such as to demonstrate that Finesman had no authority to bind Salton. This conclusion is supported by evidence that Salton subsequently offered Ullman–Briggs a two year contract with respect to sales to J.C. Penney. *See* 7/89 Tr. at 88. Furthermore, there was evidence at trial, which the Court finds credible, that the length of the contract was in lieu of a finders fee that had been promised to Ullman–Briggs for introducing Salton to Andrew Mark.[5] *See* 7/89 Tr. at 24–28, 181.

■ Furthermore, even assuming *arguendo* that Finesman did not have the actual authority to enter into the contract, plaintiff was certainly entitled to rely upon his apparent authority to execute the contract on behalf of Salton. Where a principal engages in words or conduct that give rise to the appearance that an agent has the authority to enter into a transaction, then the principal will be bound if a third-party reasonably relies upon that appearance of authority. *See, e.g., Hallock v. State*, 64 N.Y.2d 224, 231, 474 N.E.2d 1178, 1181, 485 N.Y.S.2d 510, 513–14 (1984); *Greene v. Hellman*, 51 N.Y.2d 197, 204, 412 N.E.2d 1301, 1306, 433 N.Y.S.2d 75, 80 (1980). Here, Salton held Finesman out to the industry as its president and allowed him to enter into contracts on its behalf. Accordingly, he was clothed with a broad apparent authority and Ullman–Briggs's reliance upon that apparent authority was reasonable, especially since, as noted above, the contract was not so unusual that plaintiff should reasonably have known that he had no authority to make it.

■ Defendant further contends that even if there were a valid agreement between the parties, that agreement was replaced by a new one formed at the hurricane meeting, *i.e.*, that there was a novation. The elements of a novation are: (1) a previously valid obligation; (2) an agreement of all parties to the new contract; (3) extinguishment of the old contract; and (4) a valid new contract supported by consideration. *See French American Banking Corp. v. Flota Mercante Grancolombiana*, 609 F.Supp. 1352, 1357 (S.D.N.Y.1985); *VJK Productions, Inc. v. Friedman/Meyer Productions, Inc.*, 565 F.Supp. 916, 921 (S.D.N.Y.1983).

However, the evidence at trial here falls far short of establishing a novation. There was absolutely no evidence of any intent by either party to substitute one agreement for the other nor was there even any evidence that any new agreement was made at either the hurricane meeting or the subsequent meeting in Chicago. This is especially so in light of the testimony, which the Court finds credible, that neither Ullman nor Briggs mentioned the August 5 contract at either meeting and therefore could not have manifested any intention to substitute a new agreement for that agreement.

■ Defendant also argues that plaintiff should be estopped from asserting a claim for damages for breach of contract because they failed to disclose their intention to sue Salton for breach of the August 5 contract. This contention must be rejected. Since Ullman–Briggs' relationship to Salton was that of contracting parties, and Salton had unilaterally terminated that relationship, Ullman–Briggs had no duty to make any such disclosure and its failure to do so therefore cannot afford an adequate predicate for any estoppel claim. *See* Transcript of Liability Summations ("11/89 Tr.") at 36–37; *Long Island Lighting Co. v. General Electric Co.*, 712 F.Supp. 292, 300 (E.D.N.Y.1989); *Cabrini Medical Center v. Desina*, 64 N.Y.2d 1059, 1062, 479 N.E.2d 217, 219–20, 489 N.Y.S.2d 872, 874 (1985). Moreover, estoppel depends upon reasonable reliance upon the non-disclosure detrimental to the relying party, a claim hardly colorable where, as here, Salton knew that it had unilaterally terminated the agreement. *See* 7/89 Tr. at 271–73, 310–15.

---

5. Although Ullman–Briggs' claim for a finders fee was voluntarily dropped after the commencement of the trial, evidence regarding that claim is still relevant to the question of Finesman's authority to make it.

The Court therefore concludes that Ullman–Briggs is not estopped from suing on this contract.

■ Having found that plaintiff has met its burden of proof on liability, the Court must now address the amount of damages which Ullman–Briggs is entitled to as a result of defendant's breach. It is well-settled that a plaintiff in a contract action must demonstrate both that his damages were caused by the alleged breach and that the alleged loss is capable of proof with reasonable certainty. *Lexington Products, Ltd. v. B.D. Communications, Inc.,* 677 F.2d 251, 253 (2d Cir.1982); *Kenford Co. v. County of Erie,* 67 N.Y.2d 257, 261, 493 N.E.2d 234, 235, 502 N.Y.S.2d 131, 132 (1986). Damages in a breach of contract action are intended to put the injured party in the same position they would have been in if the contract had been performed. *See Wallace Steel, Inc. v. Ingersoll–Rand Company,* 739 F.2d 112, 115 (2d Cir.1984); *Brown v. Lockwood,* 76 A.D.2d 721, 742–743, 432 N.Y.S.2d 186, 201 (2d Dep't 1980). The Court concludes that plaintiff has carried that burden to the extent discussed below.

In the ten months that Ullman–Briggs did represent Salton, including three months under the written contract, it received $246,262 in commissions from selling Salton products. *See* 7/89 Tr. at 81; PX 22, 23. The Court accepts the testimony of Charles Briggs that had Salton continued the contract they would have earned at least the same amount of commissions per month, approximately $25,000, for the remainder of the contract and would have realized approximately $500,000 in commissions over the life of the contract.[6] *See* 5/90 Tr. at 51. Indeed, the documentary evidence establishes that Ullman–Briggs made an average of $24,626.20 per month over the ten months that they represented Salton. *See* 7/89 Tr. at 81; PX 22–23. This figure should be multiplied by the 21 remaining months on the contract to arrive at the gross loss in commissions before any offsets.[7] Accordingly, Ullman–Briggs' gross lost commissions due to the termination of the contract is $517,150.20.[8]

Plaintiff argues, relying on *Katz Communications, Inc. v. Evening News Ass'n,* 705 F.2d 20 (2d Cir.1983), that because it could have entered into sales distributorship contracts with other companies at any time it should be regarded as a lost volume seller and should receive as damages the gross commissions it lost due to Salton's termination of the contract without any offsets. *See* 5/90 Tr. at 3, 33–38. However, a party claiming to be a lost volume seller must establish that it would have had the benefit of *both* the original contract and the subsequent contracts had there not been a breach. *Teradyne, Inc. v. Teledyne Industries, Inc.,* 676 F.2d 865, 868 (1st Cir.1982) (emphasis added); *Neri v. Retail Marine Corp.,* 30 N.Y.2d 393, 399, 285 N.E.2d 311, 314, 334 N.Y.S.2d 165, 169 (1972).

This test has both objective and subjective components. First, plaintiff must demonstrate that it had the subjective in-

---

**6.** The Court rejects Dick Ullman's testimony as pure speculation that they would have received $700,000 in commissions under the contract had it been performed, *see* 7/89 Tr. at 198–200; 5/90 Tr. at 90, and consequently rejects plaintiff's suggestion that the Court should award $600,000, the average of the two estimates, as lost commissions.

**7.** At trial, the parties referred to 20 remaining months on the contract. However, there was actually a little more than 21 months remaining since it was a two-year contract commencing on August 5, 1985 and terminated as of October 31, 1985.

**8.** The Court also rejects defendant's argument that Sam Carson Inc.'s earnings of $260,000 should be used as the basis of damages. The trial testimony demonstrates that Dick Ullman and Charles Briggs are excellent salesmen and had extensive experience in selling products similar to Salton's. Sam Carson, on the other hand, had little experience selling these types of products and had done little on the Salton account when he and Ullman were involved in the Cue Group. *See* 7/89 Tr. at 28–29. Therefore, it is likely that Ullman–Briggs would have been able to maintain a higher level of sales. This conclusion is further supported by the fact that 1989 sales of Salton products under a new representative rebounded to nearly the same level as sales during Ullman–Briggs' tenure as representative in 1985. *See* 5/90 Tr. at 45–46.

tent to take on the additional lines that it acquired had it retained the Salton account. Plaintiff's own proof refuted that intent as to many of the additional lines it acquired. Indeed, Charles Briggs admitted that Ullman–Briggs would not have had the subjective intent to take on many of the additional lines if Salton had not terminated the contract. *See* 5/90 Tr. at 27. This admission in itself is fatal to Ullman–Briggs' claim that it may properly be regarded as a lost volume seller.

Secondly, as an objective component, plaintiff must also establish that it had the capacity to take on extra lines and adequately service them without additional expenditures for staff and other overhead expenses if the defendant had not breached the original contract. *See Katz, supra,* 705 F.2d at 26. This plaintiff failed to do. The evidence at trial established that Salton was the major portion of Ullman–Briggs' business and that both Ullman and Briggs devoted a substantial portion of their time to that line. Thus, unlike the situation in *Katz,* if Ullman–Briggs had taken on more lines they would have necessarily incurred increased costs because they would have been forced to either hire another sales representative or devote less time to the Salton line. In either event, the profits from the Salton line would have been reduced because of either an increase in overhead or a decrease in commissions owing from a lack of attention to the line.[9] Therefore, the Court rejects the argument that Ullman–Briggs had the capacity to take on all of the additional lines that it did and still maintain the Salton line.

In view of the circumstance that Ullman–Briggs was not a lost volume seller, certain deductions must be made from the gross commission figure of $517,150.20 to ascertain the appropriate amount of damages. The first item that must be subtracted from that figure is the costs of servicing the Salton line that Ullman–Briggs avoided due to the termination of the contract. *See Adams v. Lindblad Travel, Inc.,* 730 F.2d 89, 92–93 (2d Cir.1984). The Court finds that the evidence does not support any reduction for such costs. Although Ullman–Briggs did have more time available after the breach, the evidence indicates that they were not able to reduce any of their expenses as a result of Salton's termination of the contract because they still had to visit the same accounts for their other lines, there were no variable expenses spent directly on Salton, and Salton had a toll-free telephone number.[10] *See* 5/90 Tr. at 73, 84–85, 93–94.

However, consistent with its duty to mitigate damages, *see Air Et Chaleur, S.A. v. Janeway,* 757 F.2d 489, 494 (2d Cir.1985); *Fairfield Lease Corp. v. 717 Pharmacy, Inc.,* 109 Misc.2d 1072, 1077, 441 N.Y.S.2d 621, 624 (Civ.Ct.Bx.Co.1981), Ullman–Briggs took on additional lines that it would not have accepted if Salton had not terminated their contract, *see* 5/90 Tr. at 27–28, and a reduction must be made for commissions received on these accounts less the costs allocatable to those commissions. After the breach Ullman–Briggs

**9.** Both Ullman and Briggs testified that they could have serviced the Salton line with a significantly reduced amount of time after October 1985 because they believed that Wet Tunes had already been established in the market and would have required less of their attention. *See* 5/90 Tr. at 14; 40–41; 80–81. The Court does not find this testimony credible or consistent with business reality. Indeed, Sam Carson, Inc.'s failure to perform as well as Ullman–Briggs in servicing the Salton line underscores the importance of Briggs' and Ullman's efforts in successfully representing the Salton line and undermines their claim that their personal efforts were not continuously necessary to maintain that level of service. This is especially true since there was testimony that Salton had intro-

duced new products which presumably would have required substantial additional effort to sell. *See* 5/90 Tr. at 46–47.

**10.** This is in contrast to Sam Carson's testimony that when he began representing Salton his expenses for telephone, travel and entertainment of buyers increased. *See* 7/89 Tr. at 260–62. However, Carson's expenses increased because Salton was the first electrical appliance line that he had represented and he was forced to incur expenses to get acquainted with a whole new group of buyers. *See id.* at 259. Ullman–Briggs, on the other hand, represented several electrical appliance manufacturers and therefore would have incurred the same expenses even without the Salton line.

took on 17 new lines that produced $151,-433 in commissions over the next 21 months. *See* PX 23. Briggs testified that they would not have taken on ten of those seventeen lines, which totaled $62,367 in commissions, if Salton had not breached the contract because they were not electric houseware items and therefore were outside of Ullman–Briggs' field of expertise. *See* 5/90 Tr. at 23–28; PX 23. The Court finds that testimony credible. Accordingly, the Court accepts $62,367 as an appropriate deduction for mitigation of damages from the gross lost commissions figure.

As noted above, that mitigation figure must be reduced by the total expenses that Ullman–Briggs incurred in earning those commissions. *See Morgan v. Morgan,* 81 Misc.2d 616, 619, 366 N.Y.S.2d 977, 980 (Sup.Ct.N.Y.Co.1975). The evidence established that after the breach Ullman–Briggs sustained increases in travel, entertainment, telephone, postage and freight, and trade show expenses in their efforts to obtain new lines totaling $23,993. *See* DX 1. The Court rejects plaintiff's testimony that this increase in expenses was due solely to the accounts that they would not have taken on but for the breach. *See* 5/90 Tr. at 28–37. It is hardly rational to believe that Ullman–Briggs would have incurred $23,993 in expenses in order to obtain and service ten lines that realized $62,367 in commissions, and no expenses in obtaining and servicing seven lines that brought in $90,859.80. *See* DX I, PX 23. It is more reasonable to conclude, and the Court so finds, that the additional expenses should be apportioned on a *pro rata* basis between the lines that Ullman–Briggs would have represented without a breach and the lines that it would not have acquired. Since the commissions allocable to the lines that Ullman–Briggs took in mitigation of its damages constitutes approximately 40% of the total commissions received, the amount of mitigation expenses to which Ullman–Briggs is entitled as an offset to the commissions earned should also be 40% of their total increase in expenses after the breach, which is $9,597.20. Thus, the Court finds that Ullman–Briggs' net damage award before interest is $464,380.40.

Ullman–Briggs is clearly entitled to prejudgment interest on its damages. *See* N.Y.Civ.Prac.L. & R. ("CPLR") § 5001(a) (McKinney 1963). CPLR § 5001(b) states that when damages are incurred at various times, interest may be computed upon each item from the date it was incurred or upon all of the damages from a single reasonable intermediate point. Both parties request that interest commence on October 5, 1986, and therefore the Court finds that date to be the "single reasonable intermediate point" for purposes of computing interest on the damages.

## CONCLUSION

For the reasons stated above, the Court concludes that defendant Salton is liable to plaintiff Ullman–Briggs for breach of contract and awards plaintiff the sum of $464,-380.40 plus interest at the statutory rate of 9% per annum commencing on October 5, 1986. Plaintiff shall submit an appropriate judgment to the Court on notice to the defendant within two weeks of the date of this Opinion and Order.

It is SO ORDERED.